## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 1:19-cv-23225

CINDY DIFFENDERFER,

        Plaintiff,

vs.                                                                    **COMPLAINT**

NGD HOMESHARING, LLC, a Florida
limited liability company, and HARVEY
HERNANDEZ, individually,

        Defendants.

_____/

    Plaintiff, CINDY DIFFENDERFER ("DIFFENDERFER"), by and through the undersigned counsel, hereby sues Defendants NGD HOMESHARING, LLC, a Florida limited liability company ("NGD HOMESHARING"), and HARVEY HERNANDEZ ("HERNANDEZ"), individually, (collectively, "DEFENDANTS"), and further states:

### JURISDICTION, PARTIES, AND VENUE

    1.    This Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under 28 U.S.C. § 1331, as this action is brought under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This Court also has supplemental jurisdiction for the state law claims pursuant to 28 U.S.C. § 1367.

    2.    At all times material, Plaintiff CINDY DIFFENDERFER was and is a resident of Miami-Dade County, and is *sui juris*.

    3.    At all times material Defendant HARVEY HERNANDEZ was and is a resident of Miami-Dade County, and is *sui juris*.

4.      DIFFENDERFER and Defendant HERNANDEZ are co-founding partners and members of Defendant, NGD HOMESHARING.

5.      At all times material, Defendant HERNANDEZ is the sole manager of NGD HOMESHARING.

6.      At all times materials, Defendant, NGD HOMESHARING was a Florida limited liability company authorized to do and doing business in Florida.

7.      Venue properly lies in Miami-Dade County as DEFENDANTS reside therein, all acts and omissions giving rise to these claims occurred in Miami-Dade County, and Defendant NGD HOMESHARING has its principal place of business in Miami-Dade County. Further, the 2017 Operating Agreement executed by the parties identifies Miami-Dade County, Florida as the venue for any disputes arising out of that agreement. Further, the 2019 Restated and Amended Operating Agreement executed by NGD HOMESHARING and HERNANDEZ also identifies Miami-Dade County as the venue for any disputes arising out of that agreement.

8.      All conditions precedent to the bringing of this action have been met, have occurred or have otherwise been waived.

9.      In accordance with applicable law, DIFFENDERFER shall be entitled to recoup her reasonable attorney's fees upon prevailing in this action, and hereby places DEFENDANTS on notice of her claim for such fees.

## FACTS COMMON TO ALL COUNTS

### Background on the Parties and their Relationships

10.     At all materials times, Defendant, HERNANDEZ is and was principally engaged in the development of high-end real estate projects throughout South Florida and served as an officer, director and sole managing member of Newgard Development Group, Inc. ("Newgard").

11.     At all times material, Plaintiff, DIFFENDERFER is and was a South Florida-based businesswoman and entrepreneur with significant experience in marketing, licensing and developing internet and app-based products and businesses.

12.     DIFFENDERFER is a founder and was the Chief Marketing Officer of Defendant, NGD HOMESHARING, which owns and operates under the tradenames "Niido" and "Natiivo" [Powered by Airbnb] and was established to develop, build, market, rent, sell, and manage residential properties and/or hybrid condo-hotels designed specifically for "homesharing" activity supported by a proprietary software platform and app. NGD HOMESHARING and its affiliates have generated significant attention and has generated significant press due to its innovative concept that has also attracted customers and investors. *See* **Composite Exhibit "A"**.

13.     Defendant, NGD HOMESHARING shares a relationship with Airbnb, Inc. ("Airbnb")[1] for investment, management, and marketing rental properties specifically and currently in Orlando, Florida and Nashville, Tennessee.

14.     For the Orlando and Nashville properties, Niido not only assumes the responsibility for leasing individual units to tenants (who are thereafter allowed to rent their units to Airbnb guests), Niido itself is also a tenant of these two properties where it leases a large number of units to itself for the sole purpose of re-leasing them to Airbnb guests for nightly and short-term stays.

15.     In addition to these two properties, funding and rights have been secured for two additional properties that are being built as hybrid condo-hotels, one in Austin, Texas, and the other in Miami, Florida, under the same model described above, using the related trade name

---

[1]     Airbnb, Inc., is an American online marketplace and hospitality service brokerage company based in San Francisco, California. Members can use the service to arrange or offer lodging, primarily homestays, or tourism experiences. The company does not own any of the real estate listings, nor does it host events; it acts as a broker, receiving commissions from each booking.

"Natiivo".

**HERNANDEZ and DIFFENDERFER Discuss New Partnership Connecting Real Estate Development to an Internet Homesharing Platform and App**

16.     In early August 2015, HERNANDEZ requested a meeting with DIFFENDERFER, stating he wanted to introduce DIFFENDERFER to his business partner, Barbara Salk ("Salk") to discuss a new business venture that would involve DIFFENDERFER becoming a partner as HERNANDEZ wanted to profit from DIFFENDERFER's knowledge, skills, experience, and contacts regarding internet and app-based services and businesses, particularly in the real estate space.  DIFFENDERFER readily agreed to meet with them to discuss a partnership.

17.     From their prior social encounters, HERNANDEZ knew that DIFFENDERFER had extensive contacts and experience in developing and launching consumer focused products for the hospitality and travel industries working with and creating web and app-based business ventures.  HERNANDEZ had previously expressed interest in investing in an "Internet of Things" smart wine machine that DIFFENDERFER had created, designed, and patented.

18.     HERNANDEZ knew DIFFENDERFER was a creative technology focused entrepreneur who knew how to take a concept and turn it into a business.

19.     At their first meeting on August 4, 2015, DIFFENDERFER, Salk, and HERNANDEZ spoke generally about the potential for developing a condominium-style residential complex with units that would be primarily marketed for use and rental in the internet and app-based homesharing market, not unlike those offered through Airbnb by private homeowners and rental communities. The three decided to further discuss and refine the concept together over a series of meetings that followed.

20.     Throughout a series of subsequent meetings, it was decided that DIFFENDERFER, Salk, and HERNANDEZ would develop the new concept and start a new business venture as co-

founders/partners. It was understood that HERNANDEZ's contribution to the partnership would primarily be financial, Salk would contribute her administrative, operational and financial management skills, and DIFFENDERFER would contribute her substantial creative talents, marketing expertise, fundraising experience and network, technology background, entrepreneurial skills, time and relevant experience in starting internet and app-based companies to forge strategic relationships, develop the necessary proprietary technology and develop and execute a business plan.

21.    During the first few months of their business relationship, HERNANDEZ continued to request that DIFFENDERFER seek out and introduce potential investors, including Airbnb, WeWork, Neuehouse, and other high-profile collaborators to the new venture and draft numerous presentations and business plans to pitch investors.

22.    As requested, DIFFENDERFER made introductions to numerous prospective capital and strategic partners, including without limitation Corigin Ventures, Aeterna Capital, Neuehouse, WeWork, Twin Focus Capital, Palm Beach Research Group and numerous other investors and strategic partners.

23.    In October 2015, at DIFFENDERFER's suggestion, DIFFENDERFER and HERNANDEZ engaged Yves Behar, a mutual business partner of both DIFFENDERFER and HERNANDEZ and Brian Chesky, the CEO of Airbnb, and other representatives of Airbnb and its affiliates. At that time, HERNANDEZ and Salk had only ever read or heard about Airbnb and had never actually hosted or traveled using Airbnb or any other homesharing platform.

24.    DIFFENDERFER helped set up both HERNANDEZ's and Salk's individual profiles on Airbnb and DIFFENDERFER insisted that in advance of their meeting in San Francisco at Airbnb's headquarters that both HERNANDEZ and Salk actually stay in an Airbnb property.

25.    Since 2011, DIFFENDERFER had both hosted and traveled on Airbnb extensively and was the only member of the three-member partnership with any actual experience with homesharing as either a traveler or a host.

26.    Before acquiescing to DIFFENDERFER's demand that he travel and host on Airbnb's platform, HERNANDEZ resisted stating he would never stay at an Airbnb property because he is "luxury" traveler and did not have a need or desire for the homesharing lifestyle.

27.    Following their presentation in San Francisco, a follow-up meeting was arranged with HERNANDEZ, Salk, DIFFENDERFER, Airbnb, the architecture firm Arquitectonica, among others, all of whom agreed to meet in South Florida for a presentation of the new internet and app-based apartment/condominium style development homesharing concept (hereinafter, the "Homesharing Venture" or "Venture").

28.    The essential elements of the Homesharing Venture as conceived and developed by DIFFENDERFER, HERNANDEZ and Salk was that their partnership would raise investor funds to construct, own, manage and lease apartment and condominium properties specifically designed for the homesharing lifestyle. The Venture would require the development of proprietary software and effective branding to attract not only the necessary investors and strategic partners, but also to attract users. Very early on during their initial meeting, DIFFENDERFER identified Airbnb as the primary strategic partner and potential investor that could make the Venture a success.

29.    During the first few months of their partnership, DIFFENDERFER understood that the time she, Salk and HERNANDEZ spent on furthering the Venture was going to be un-compensated time as they had a lot of work to do to develop and refine a business plan and had no sources of revenue.

30.    At all material times, it was discussed between them that they would share

6

proportionately in the equity of the Venture based on their respective contributions (e.g. monetary, time, effort and results) to the Venture, and that they would also similarly be able to personally invest their own funds in the real estate that the Venture would acquire and develop. HERNANDEZ repeatedly expressed to DIFFENDERFER that the three partners would carve out ten percent (10%) of each real estate investment that the Venture would make for their own personal investment opportunity.

31.     Specifically, HERNANDEZ represented to DIFFENDERFER that out of the ten percent (10%) carved out, each of the three partners would be given the opportunity on a right of first refusal basis to personally invest their own funds pro rata relative to their respective ownership percentages maintained in the Venture. For example, HERNANDEZ explained that if they were equal 1/3 partners, then on a right of first refusal basis each of them would be able to personally acquire up to three and one-third percent (3.33%) interest in each real estate acquisition that the Venture would make.

32.     More than a year after DIFFENDERFER's initial meetings with HERNANDEZ and Salk, DIFFENDERFER learned that Salk was not only employed as the Chief Operating Officer of HERNANDEZ's company, Newgard, but was being paid $25,000 a month along with receiving equity and closing fees on deals HERNANDEZ was involved in.

33.     In December 2015, a memorandum of Understanding (MOU) was negotiated between Newgard (as the Venture had yet to formally organize into Defendant, NGD HOMESHARING) and Airbnb, to further explore and develop the Homesharing Venture.

34.     In January 2016, representatives of Airbnb traveled to Miami, Florida and met with DIFFENDERFER, HERNANDEZ, Salk and representatives from Arquitectonica and others.  In anticipation of the meeting, DIFFENDERFER had already authored a comprehensive written and

visual presentation and executive summary for the new Homesharing Venture titled "'Airbnb House' December 1, 2017" and presented it at the meeting.

35.     Although the initial MOU with Airbnb was executed with Newgard, HERNANDEZ, Salk, and DIFFENDERFER understood and agreed they would form a new business entity in which they would all hold a proportionate equity interest as set forth above, once the Venture was formally organized as a business entity for outside investors.

36.     Defendant, NGD HOMESHARING's Articles of Organization were filed with Florida's Secretary of State on September 12, 2016. HERNANDEZ listed himself as the "manager" on the Articles of Organization.

37.     DIFFENDERFER was responsible for rapidly converting and implementing the partners' initial idea into a business plan and quickly into a real business; she was principally involved in taking the Homesharing Venture from a loosely defined concept to a viable business, now known as Defendant NGD HOMESHARING, LLC, that recently raised $10,000,000 in investor capital, at a valuation of $65,000,000.00.

**<u>HERNANDEZ's Promises Regarding Equity and Compensation</u>**

38.     In December 2015, when the MOU with Airbnb was being finalized, HERNANDEZ reiterated to DIFFENDERFER that as an originator and co-founder of the Venture, DIFFENDERFER would share in a proportionate equity stake in the Venture, commensurate with her contributions to the Venture relative to that of HERNANDEZ and Salk. Specific ownership percentages were not discussed at that time, it was simply stated that the ownership percentages would be "equitable" based on the three partners' respective contributions. Further, it was agreed that DIFFENDERFER would hold an executive employment position as Chief Marketing Officer with the then yet-to-be formed business entity that would house the Venture.

39.     Also starting in December 2015, and many times thereafter, in addition to discussing the equitable and proportionate ownership percentage interest that DIFFENDERFER would receive in the Venture, HERNANDEZ continually promised DIFFENDERFER that once certain fundraising benchmarks were achieved DIFFENDERFER would begin receiving a salary as Chief Marketing Officer of at least $250,000/year and benefits.

40.     To ensure that DIFFENDERFER did not lose interest in the Venture and that she continued to devote her time, skills, reputation and contacts to the Venture, in December 2015, HERNANDEZ told DIFFENDERFER that starting then she would accrue as "deferred compensation" the full amount of her salary of the $250,000 / year, and that these accrued amounts would be paid once certain fundraising benchmarks were achieved for the Venture, at which point she would also be given an executive employment agreement as Chief Marketing Officer.

41.     Since early in the Venture's existence, financial models continued to reflect an annual salary of between $250,000 and $300,000 per year for DIFFENDERFER.

42.     HERNANDEZ told DIFFENDERFER that he too would receive a salary of $250,000 / year and that he was also deferring and accruing his compensation, which would not be paid until the fundraising benchmarks were met.

43.     HERNANDEZ's representations proved to be illusory, reckless, intentionally dishonest and were intended to induce DIFFENDERFER's continued dedication of her time, efforts, skills, assets, reputation, contacts and resources to developing the Venture into a viable and ultimately successful business without ever having to pay the fair value of DIFFENDERFER's services.

44.     DIFFENDERFER went without pay during the first two years of her service to the Venture, despite dedicating her full-time and tremendous personal and professional efforts and

sacrifices to create, develop, refine and execute upon the business plan, objectives and goals of the Venture.

45.     From December 2015 through the formation of NGD HOMESEHARING in September 2016, HERNANDEZ was paying both himself and Salk while DIFFENDERFER was not being paid at all.

46.     In 2016, a fundraiser was hired for the Venture who was being paid $15,000 a month and was given an office. The fundraiser's only purpose was to raise capital for NGD HOMESHARING. He subsequently also became an investor. DIFFENDERFER fundraised and did much more for the Venture but she received only illusory "deferred compensation".

**<u>DIFFENDERFER Labors Exhaustively to Launch the New Business Venture</u>**

47.     With HERNANDEZ's knowledge and approval and incentivized by HERNANDEZ's promises of an equitable proportionate ownership percentage interest and accrued deferred compensation, DIFFENDERFER concentrated full-time on business development for the Venture.

48.     DIFFENDERFER undertook research, planning and development of nearly all aspects of the new business concept, including market analysis, business and management structure, development of investors and strategic relationships, financial projections, design and architecture of the website and application, and project design and concept.

49.     In September 2016, once NGD HOMESHARING was formed and the Venture's business plan began to take a firmer hold among potential investors, strategic partners, and with Airbnb itself, the Venture was given a trade name, "Nido", which evolved into "Niido" and "Natiivo" respectively.

50.     Also, in September 2016, in great part due to DIFFENDERFER's efforts and

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

business plan, a Collaboration Agreement was signed between NGD HOMESHARING and Airbnb.

51.     Additionally, in September 2016, DIFFENDERFER was given the official title of "Chief Marketing Officer" for Niido, but DIFFENDERFER continued in her key-woman role spear-heading all aspects of the start-up efforts, with the overarching goal of raising necessary investment capital.

52.     Despite the title, HERNANDEZ told DIFFENDERFER she would continue to accrue her "deferred compensation" and no operating agreement was presented to DIFFENDERFER reflecting her proportionate equitable ownership percentage interest as HERNANDEZ begged off discussions regarding reducing the ownership percentages to writing as he stated the primary goal was to attract investors at which point the parties would execute an operating agreement.

53.     Throughout 2017, DIFFENDERFER dedicated her efforts full-time to fine-tuning various aspects of business development, including *inter alia*, hiring media and technology consultants, negotiating contracts, including property management agreements, meeting with design, operations, software, legal, tax and finance professionals, and promoting Niido in different media forms, and among potential investors, strategic partners and Airbnb.

54.     DIFFENDERFER also devoted a significant amount of time to the development of NGD HOMESHARING's proprietary software for Niido's website and app. In originating and conceptualizing Niido's website and app design and functionality, DIFFENDERFER drew from her extensive experience with internet and app-based utilities and created modeling and functionality specific to Niido that were her proprietary brainchild.

55.     DIFFENDERFER engaged an IT advisor, Mihai Bote and hired a technology

11

development firm, Tripcraft, to build the first website and app, which was based on the architecture DIFFENDERFER had personally designed for Niido, which came to be known as "Niido Hub".

56.     For much of 2017, HERNANDEZ and DIFFENDERFER were also busy raising the initial round of investment capital from "friends and family" and successfully secured $2.5 million of seed capital in the fourth quarter of 2017.

57.     During the capital raising efforts, HERNANDEZ repeatedly represented to DIFFENDERFER as well as to numerous other potential investors and others, that HERNANDEZ had personally invested $1.5 million of cash into NGD HOMESHARING for Niido's development and to cover NGD HOMESHARING's expenses until such time as outside capital was raised.

### HERNANDEZ Rebukes DIFFENDERFER's Request for Compensation After Initial Capital Raise

58.     In November 2017, Niido successfully received the first $2.5 million in investment capital, with NGD HOMESHARING issuing to "friends and family" promissory notes that could be converted into equity based upon a $10 million business valuation.  NGD HOMESHARING had also cultivated another major investor, Brookfield Property Group, and secured a commitment of $200 million for real estate acquisitions with the sole purpose of buying multi-family buildings or condominiums to convert into the Niido homesharing concept.

59.     This investment was run through a special purpose vehicle by and through its affiliate(s) including BOP Nest Domain TRS LLC (collectively, "Brookfield") of which HERNANDEZ is a member, a fact that was not known or disclosed to DIFFENDERFER.

60.     Brookfield was to be issued a series of three (3) investment warrants. These warrants allowed Brookfield to acquire up to twenty-five percent (25%) of NGD HOMESHARING without having to actually invest a single dollar into the company itself. The warrants gave protective rights, anti-dilution protection, and below market exercise prices in

exchange for the investment in the real estate which was secured by NDG HOMESHARING guaranteeing certain monthly and nightly occupancy rates, rent premiums and services all paid for by NGD HOMESHARING and run by the NGD HOMESHAIRNG employees and their affiliate management team led by RAMM Property Management ("RAMM").

61.     Prior to, during, and following the initial capital raise event, DIFFENDERFER, who had labored exhaustively on behalf of NGD HOMESHARING without remuneration, approached HERNANDEZ about agreeing to document her proportionate equitable ownership percentage interest, her accrued "deferred compensation" and executing an employment agreement.

62.     HERNANDEZ again begged off any further discussion regarding compensation with DIFFENDERFER, and instead provided promises and general assurances of her importance to the company, that she should "trust" him as everything he was doing to raise investor capital would benefit her, and that she would be "taken care of."

63.     At the closing of the seed round of funding, it was agreed that DIFFENDERFER and all other executive level personnel would receive $10,000 per month to be paid in cash and would continue to accrue the balance of their agreed to salaries as "deferred compensation" pending the closing of the Series A round of funding.

64.     DIFFENDERFER agreed to this arrangement as it was in the best interest of NGD HOMESHARING so the newly invested capital could run the business for an extended period prior to the need for another capital raise.  HERNANDEZ told DIFFENDERFER that her accruals were for the balance of her $250,000 annual salary, plus a bonus (e.g. accruing $130,000 / year).

**DIFFENDERFER Falsely Induced and then Forced to Sign 2017 Operating Agreement
Over Objection and Under Duress**

65.     In the fourth quarter of 2017, HERNANDEZ and his personal counsel spent weeks negotiating an operating agreement for NGD HOMESHARING with Brookfield, excluding DIFFENDERFER from most of those discussions.  On the few occasions when DIFFENDERFER was consulted on the draft agreement, she voiced concerns over the onerous terms being applied against NGD HOMESHARING in favor of Brookfield to which HERNANDEZ responded defensively and aggressively.

66.     When DIFFENDERFER and even HERNANDEZ's personal counsel told HERNANDEZ that the terms of the operating agreement were a "bad deal" for NGD HOMESHARING, HERNANDEZ responded by saying that by accepting Brookfield's terms "it secured NGD HOMESHARING's future investment in real estate, which is the goal"—e.g. for NGD HOMESHARING to acquire and build as many buildings as possible which would in turn enrich HERNANDEZ, DIFFENDERFER, and NGD HOMESHARING.

67.     During the latter half of 2017, when the parties discussed the terms of a prospective operating agreement and on numerous occasions previously, HERNANDEZ told DIFFENDERFER that he had personally contributed $1.5 million in "cash" to the Venture and that he therefore would take a seventy (70%) ownership interest in NGD HOMESHARING, that Salk's ownership percentage was to be twenty percent (20%) based on her early contributions to the Venture, and that the remaining ten percent (10%) would be for DIFFENDERFER.

68.     In those meetings, HERNANDEZ also stated that as part of Brookfield's agreement to invest in NGD HOMESHARING, Brookfield required both DIFFENDERFER and HERNANDEZ to have equity vesting schedules for a portion of their equity interests and that they both had to dedicate 100% of their time to NGD HOMESHARING during the entire vesting period

to ensure they remained with the company.

69.     To that point, and thereafter, HERNANDEZ never dedicated 100% or even a majority of his working time to NGD HOMESHARING, its management, growth, or operations; leaving that to DIFFENDERFER various consultants and the contractors and staff DIFFENDERFER hired to help develop and operate NGD HOMESHARING.

70.     HERNANDEZ told DIFFENDERFER that as CEO of NGD HOMESHARING, Brookfield also required HERNANDEZ to agree that he not take any vacation for three (3) years post-investment.

71.     HERNANDEZ said these terms were part of his "Employment Agreement" with NGD HOMESHARING. Despite several requests for this document, HERNANDEZ has never furnished it to DIFFENDERFER.

72.     Similarly, HERNANDEZ never provided DIFFENDERFER with access to the financial books and records since inception of the Venture back in 2015 or even after NGD HOMESHARING was formed, nor at any time thereafter up to and through the date she was wrongfully terminated from NGD HOMESHARING in February 2019.

73.     In October 2017, DIFFENDERFER received a draft version of the proposed operating agreement. The draft provided that DIFFENDERFER would vest five percent (5%) of her membership units immediately upon the signing of the operating agreement and would receive a remaining five percent (5%) in accordance with a two-year vesting schedule, giving DIFFENDERFER a ten percent (10%) ownership percentage in the company with anti-dilution protection.

74.     As the agreement was being revised and finalized, DIFFENDERFER requested on numerous occasions to view the working draft so she could voice her opinion, but she was denied

access to this information.

75.     DIFFENDERFER inquired why she was only being given a maximum of a ten percent (10%) ownership interest in NGD HOMESHARING, to which HERNANDEZ responded that his equity share was due to his having personally contributed $1.5 million in "cash" to NGD HOMESHARING, and he further stated that the only contribution DIFFENDERFER had made was her time and ideas.

76.     At approximately 5:30 am on November 29, 2017, DIFFENDERFER received an urgent email communication sent on behalf of NGD HOMESHARING transmitting a 46-page single-spaced Operating Agreement for NGD HOMESHARING (the "2017 Operating Agreement") that was sent in final form. In the early morning hours, DIFFENDERFER was instructed to sign the 2017 Operating Agreement, as is, by no later than 12:00 pm that same day as the document was critical for completing the investment transaction with Brookfield and other investors, though they were not parties or signatories to the 2017 Operating Agreement.

77.     Unbeknownst to DIFFENDERFER, in the final 2017 Operating Agreement, HERNANDEZ surreptitiously changed numerous material terms from how they were represented to DIFFENDERFER previously and failed to advise DIFFENDERFER of these material changes.

78.     Specifically, HERNANDEZ changed the final 2017 Operating Agreement so that HERNANDEZ did not have a vesting schedule while all DIFFENDERFER's (i.e. the other co-founder's) ownership interest was made subject to a vesting schedule.   As revised by HERNANDEZ, DIFFENDERFER would not vest *any* membership units until one year after the 2017 Operating Agreement was executed and would not fully vest until two years following execution.

79.     In the final 2017 Operating Agreement sent to DIFFENDERFER for execution,

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

there was no mention of Salk or her membership units and Salk's twenty percent (20%) of NGD
HOMESHARING membership units were partially usurped by HERNANDEZ (who took more
than 83% of the equity interests for himself).

80.     The 2017 Operating Agreement listed only two Officers of NGD
HOMESHARING: (a) HERNANDEZ as the Chief Executive Officer and (b) DIFFENDERFER
as the Chief Marketing Officer.

81.     At approximately 11:30 am on November 29, 2017, before DIFFENDERFER had
a meaningful ability to review the 2017 Operating Agreement or consult an attorney on her own
behalf, HERNANDEZ requested DIFFENDERFER come to his office and, using threats and
intimidation, he demanded that she execute the 2017 Operating Agreement immediately.
HERNANDEZ indicated that he would view her delay in signing the 2017 Operating Agreement
or her request for any changes to be made thereto, as obstruction and interference with the
advantageous investment relationship that NGD HOMESHARING would be entering with
Brookfield, and other investors.

82.     DIFFENDERFER told HERNANDEZ that she needed more time and that she
objected to being placed under such duress and being given virtually no opportunity to review the
document or seek the advice of her own legal counsel. In response, HERNANDEZ instructed
DIFFENDERFER to sign the 2017 Operating Agreement or risk having her role in NGD
HOMESHARING immediately terminated, resulting in DIFFENDERFER not receiving her
accrued "deferred compensation" (which by that point was nearly $500,000), and having all her
efforts over the prior two years go to waste.

83.     In addition to not being able to meaningfully review the document,
DIFFENDERFER was told that no changes would be made to the 2017 Operating Agreement and

that she needed to "trust" HERNANDEZ as he was looking out for her best interest. NGD HOMESHARING's then-newly appointed General Counsel, Warren Stamm ("Stamm") was present with HERNANDEZ and DIFFENDERFER on November 29, 2017 and he reiterated the sense of urgency and that absolutely no changes would be accepted or made to the 2017 Operating Agreement.

84.     When DIFFENDERFER inquired of HERNANDEZ why her entire equity interest was conditioned on future performance and conditional approval, and was limited to seven and one-half percent (7.5%) after one year and ten percent (10%) after two years, compared to HERNANDEZ immediately fully vesting an interest of 83.57%, HERNANDEZ once again responded that his equity share and his immediate vesting was due to his having personally contributed $1.5 million in "cash" to NGD HOMESHARING.

85.     No supporting financials or source of funds to reflect HERNANDEZ's purported contribution has ever been shown to DIFFENDERFER after numerous requests for this information.

86.     Rather than risk the loss of the investors and the threatened ramifications of same, with the threat of a loss of her position, accrued "deferred compensation", ownership percentage, and having her exhaustive efforts over the prior two years go to waste, and further based upon HERNANDEZ's representations regarding his purported personal cash investment of $1.5 million, with no alternative option and no time to review the documents, DIFFENDERFER reluctantly executed the 2017 Operating Agreement at the demand of HERNANDEZ.

87.     After executing the 2017 Operating Agreement and reviewing it with counsel, it became clear that it materially differed from the verbal representations and assurances that HERNANDEZ had repeatedly made to DIFFENDERFER during the prior two years, and that

those differences uniquely and negatively impacted DIFFENDERFER.

88.     The equity distribution and the vesting schedule were not part of any of her earlier equity-related discussions with HERNANDEZ and were not as agreed to or understood at any time between the parties.

89.     Additionally, it became clear that the Warrants provided to Brookfield were tied directly to real estate investments, and no corresponding documents were provided to DIFFENDERFER with respect to those related transactions.

90.     Upon information and belief, DIFFENDERFER came to believe the execution of the 2017 Operating Agreement coincided with HERNANDEZ separately closing with Brookfield, to his own personal benefit and to the unique detriment of DIFFENDERFER, on the capital necessary to acquire an Orlando property through one or more of HERNANDEZ's other business entities in which DIFFENDERFER had no interest.

91.     HERNANDEZ's separate dealings were referenced in the Brookfield Warrants, Side Letters, Operating Agreement for BOP Nest Domain, and other documents that HERNANDEZ willfully withheld from DIFFENDERFER so that she could not review those documents or understand the transaction prior to being threatened and made to execute the 2017 Operating Agreement to her unique detriment.

92.     Article V of the 2017 Operating Agreement established that NGD HOMESHARING would be managed by its Class A Members, of which HERNANDEZ provided himself with a Supermajority interest.  Similarly, Article V states Major Decisions will require a vote of the Class A Supermajority, effectively ensuring HERNANDEZ maintained total and exclusive control over all decisions of NGD HOMESHARING, neutralizing DIFFENDERFER entirely. Additionally, at all material times, HERNANDEZ appointed himself and acted as

Manager of NGD HOMESHARING.

93.     Article VI of the 2017 Operating Agreement also includes exculpatory language intended to waive statutory and common law fiduciary duties owed by HERNANDEZ to DIFFENDERFER, which language is manifestly unreasonable, particularly under the circumstances here.

94.     The 2017 Operating Agreement also contained several unreasonable, overbroad and arbitrary restrictive covenants.  In part, Section 5.8, titled, "Restrictive Covenants", provides:

> 5.8 Restrictive Covenants.
>
> (a) As a material inducement to the Company and to each other Member to enter into this Agreement, **each Member agrees** that, for so long as such Member remains a Member and for a period of 18 months following the date on which such Member ceases to be a Member, **such Member shall not**, and shall cause his or her Affiliates not to, directly or indirectly:
>
> (i) **own any interest in, manage, control, participate in, consult with, render services for** (as a director, officer, employee, agent, broker, partner, contractor, consultant or otherwise) or be or become engaged or involved in any Restricted Business within the Restricted Territory, **including by being or becoming an** organizer, owner, co-owner, trustee, promoter, **Affiliate**, investor, lender, partner, joint venturer, stockholder, officer, director, **employee**, **independent contractor**, manager, salesperson, representative, associate, consultant, agent, broker, supplier, licensor, analyst or advisor **of, to or with any Restricted Business**;
>
> (ii) make any investment (whether equity, debt or otherwise) in, lend or otherwise provide any money or assets to, or provide any guaranty or other financial assistance to any Restricted Business within the Restricted Territory; or
>
> (iii) provide any information, assistance, support, product, technology or intellectual property to any Person engaged or involved in any Restricted Business within the Restricted Territory.
>
> (b) Notwithstanding anything to the contrary in Section 5.8(a), a Member may, directly or indirectly, own, solely as an investment, the equity securities of any corporation engaged in the Restricted Business which are publicly traded on a national or regional stock exchange or on the over-the-counter market, but only if such Member (i) is not a controlling person of, or a member of a group which controls, such corporation, (ii) does not directly or indirectly own more than one percent (1%) of any class of securities of such corporation, and (iii) does not undertake any of the activities contemplated by Section 5.8(a) above (other than the purchase of

such equity securities) and otherwise has no active participation in the business of such corporation.
(c) Section 5.8(a) shall not apply to Brookfield or its Affiliates and assigns.
(emphasis added)

95.     The 2017 Operating Agreement defines the "Restricted Territory" as the entire United States.

96.     The 2017 Operating Agreement defines the "Restricted Business" as "any business, activity, enterprise or venture that conducts activities or provides products or services of the type conducted, offered or provided by the company from time to time."

97.     The 2017 Operating Agreement defines an "Affiliate" as "any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise." A true and correct copy of the 2017 Operating Agreement is attached as **Exhibit "B"**.

98.     DIFFENDERFER has abided by the Restrictive Covenants.

99.     The Restrictive Covenants are unreasonable in breadth, duration and location, and are not reasonably designed to protect a legitimate business interest of NGD HOMESHARING.

100.     The Restrictive Covenants unreasonably restrict the marketability of membership units in NGD HOMESHARING, and therefore unreasonably suppressed the value of DIFFENDERFER's ownership interest as they purported to drastically restrict the employment, contracting and investment rights of any future prospective member to whom DIFFENDERFER may have wished or may currently wish to sell her membership units simply by virtue of such prospective member assuming a membership interest in NGD HOMESHARING.

101.     HERNANDEZ also executed the same 2017 Operating Agreement with the included Restrictive Covenants.

102.    Despite serving as the Supermajority Class A member and the sole Manager for NGD HOMESHARING, HERNANDEZ has not observed or abided by the restrictions in the Restrictive Covenants and has participated directly and indirectly in Restricted Business activities in the Restricted Territory, without consequence.

103.    Similar to HERNANDEZ, multiple other members, employees, contractors and agents of NGD HOMESHARING have participated directly and indirectly in Restricted Business activities in the Restricted Territory as those terms are defined in the 2017 Operating Agreement, and have been permitted to, and otherwise have received "side letters" or waivers, that purport to permit such member unit holders to circumvent compliance with the Restrictive Covenants.

104.    In multiple instances, corporate governance documents, restrictive covenant agreements, and oral permission and/or "side letters" excusing compliance with the Restrictive Covenants have been the product of conflict of interest transactions that HERNANDEZ has not disclosed and has not sought authority to enter into such transactions from disinterested members, including without limitation, DIFFENDERFER.

105.    For example, the new Chief Marketing Officer surreptitiously hired by HERNANDEZ to replace DIFFENDERFER, Kimberly Walker was given an employment agreement that does not require her to follow the same restrictive covenants as placed on other NGD HOMESHARING officers and members and specifically allows her to compete directly with the business, including with key local competitors.

### DIFFENDERFER Objects to Retention of New Conflicted Executive Chief Operating Officer and Blows the Whistle on His Activities

106.    In November 2017, HERNANDEZ hired a business operations consultant to fill the role of a Senior Vice President of Operations (the "Consultant") for NGD HOMESHARING who was an active consultant with a competitive private equity firm (the "Competitive Firm").

107.    The  Consultant maintained a long-term contract with the Competitive Firm, which ultimately created a direct conflict of interest with NGD HOMESHARING when, in 2018, HERNANDEZ unilaterally decided to elevate the Consultant's role by offering him the position of Chief Operating Officer ("COO") at NGD HOMESHARING. HERNANDEZ allowed the Consultant, who had by then become the COO, to remain a consultant with the Competitive Firm throughout the entire period he would serve as COO with NGD HOMESHARING.

108.    The conflict was apparent enough that the Competitive Firm was listed as a "Competitor" in NGD HOMESHARING's 2019 Operating Agreement for purposes of placing restrictions on the sale of membership units by current members to the Competitive Firm.

109.    When DIFFENDERFER learned of HERNANDEZ's decision to make the Consultant COO, she first inquired with HERNANDEZ whether the potential conflict was addressed and then whether NGD HOMESHARING had disclosed the potential conflict to the new investors. HERNANDEZ ignored her concerns and DIFFENDERFER never saw any evidence of the disclosure.

110.    DIFFENDERFER continually vocalized to HERNANDEZ her concerns with the COO due to his on-going business conflicts with the Competitive Firm, his apparent inability ability to perform his job as COO, his behavior towards his peers and subordinates and various attempts to appropriate NGD HOMESHARING's intellectual property.  No action was taken based on DIFFENDERFER's repeated objections.

111.    On numerous occasions, and at DIFFENDERFER's insistence the COO's problematic behavior was documented by NGD HOMESHARING's vendors, consultants and employees yet HERNANDEZ refused to take any action claiming – "we can't have any instability in our team before Series A closes."

112.   The COO's problematic conduct and poor performance were known to HERNANDEZ, Stamm, CFO Seth Zimmerman, CTO Todd Butler, yet the COO remained in his role until April 2019, after the Series A funding was complete.

113.   Through his business entity, the COO had a consulting contract with NGD HOMESHARING that specifically allowed him to work with competitive businesses.   On information and belief, HERNANDEZ also provided the COO a waiver and release that allowed him to work for anyone, including the Competitive Firm.

114.   The COO had access to revenue modeling, proprietary tools and advantageous business information that he verbally expressed an interest in using in furtherance of his services to the Competitive Firm.

115.   Following DIFFENDERFER's repeatedly expressed concerns, when a revenue manager sent a detailed letter to DIFFENDERFER, NGD HOMESHARING's general counsel, CTO, CFO and VP of Acquisitions regarding these concerns, NGD HOMESHARING's management ignored the letter.

116.   DIFFENDERFER later inquired with NGD HOMESHARING's corporate counsel during the due diligence process with Airbnb whether the COO's conflict as a consultant for the Competitive Firm had been disclosed to the potential investors.  His response was that "he had no prior knowledge" of the COO's direct conflict and that it was not brought to his attention by HERNANDEZ.

117.   At other times, DIFFENDERFER reminded HERNANDEZ and other executives of the impropriety of retaining a conflicted executive, particularly when the conflict was not being disclosed to a potential Series A investor. DIFFENDERFER's protests were repeatedly and systematically disregarded.  Not only were they ignored, HERNANDEZ threatened her to keep

quiet on the subject or there would be "repercussions".

118.    Despite other Officers and Members of NGD HOMESHARING being bound by the same Restrictive Covenants, NGD HOMESHARING turned a blind eye to the COO's activities which are competitive with NGD HOMESHARING.

**DIFFENDERFER Begins to Receive 1099 Compensation from NGD HOMESHARING**

119.    In December 2017, once the initial $2.5 million capital raise was complete, more than two years after DIFFENDERFER began dedicating her full-time, including nights and weekends, to develop and launch the Venture that became NGD HOMESHARING while only receiving the promise of "deferred compensation" and proportionate equity, HERNANDEZ told DIFFENDERFER she would be paid as a 1099 independent contractor, with $10,000 being paid as a retainer each month and the balance of her promised $250,000 deferred compensation (i.e. $10,833/month) being added to DIFFENDERFER's accrued deferred compensation that had already been accumulating since December 2015.

120.    HERNANDEZ promised DIFFENDERFER that upon NGD HOMESHARING achieving its next fundraising benchmark, DIFFENDERFER would receive an executive employment contract and be paid her total accrued "deferred compensation" owed to her since December 2015.

121.    Despite HERNANDEZ telling DIFFENDERFER that she was performing her services for NGD HOMESHARING as a 1099 independent contractor, DIFFENDERFER never received an independent contractor agreement, nor did she ever have control over the manner and method of the services she rendered.  She took directions and instructions from HERNANDEZ at NGD HOMESHARING, and she did not set her own schedule or place of work, which was at NGD HOMESHARING's offices.

122.    DIFFENDERFER was integral to NGD HOMESHARING's operations and she devoted her full-time and set hours to NGD HOMESHARING. In fact, the 2017 Operating Agreement, which was drafted by HERNANDEZ and presented to DIFFENDERFER for her immediate signature without allowing her time to review or suggest changes thereto, contemplated and treated DIFFENDERFER as a full-time employee of NGD HOMESHARING.  Specifically, in addition to naming DIFFENDERFER as the "Chief Marketing Officer", the equity vesting schedule required her to devote "all of her time" to working at NGD HOMESHARING for a two-year period before she could receive her ten percent (10%) membership interest in the company she founded and built from the ground up, stating in pertinent part:

> **13.18 Diffenderfer Unit Vesting**. Diffenderfer shall receive additional Class A Units pursuant to the following terms and conditions:
>
> (a) In order to be eligible to receive any Units pursuant to this Section 13.18, the Class A Majority shall have determined, in its good faith reasonable discretion, that Diffenderfer shall have dedicated substantially **all of her time** to the to the business of the Company, and **shall not have engaged in any other business venture other than for a period of de minimis time**.
>
> … (emphasis added).

123.    Throughout 2018, DIFFENDERFER sought reassurances from HERNANDEZ regarding her promised employment agreement, benefits and "deferred compensation". HERNANDEZ continued to assure and promise DIFFENDERFER that an executive employment agreement for a guaranteed term at the rate of $250,000/year plus benefits (with $300,000 per year reflected for DIFFENDERFER's compensation package in the Company's financial statements) was forthcoming, and that she would be paid her accrued "deferred compensation" once the fundraising benchmark was met. HERNANDEZ also shared certain of NGD HOMESHARING's September 2018 financial projections with DIFFENDERFER that reflected her salary and benefits

being paid in full starting the month the Series A funding was expected to close.  *See* **Exhibit "C"**.

124.    Throughout 2018, when DIFFENDERFER would raise the issue of her "deferred compensation" and her desire to be paid and be treated as an employee, HERNANDEZ would state that he was also deferring his own compensation since December 2015 and that he too would receive a payout of his accrued deferred compensation once the Series A funding closed.  On information and belief, when the Series A funding came in at the end of 2018, HERNANDEZ paid himself part of his accruals dating back to December 2015 in the amount of $390,000, and as of January 4, 2019 NGD HOMESHARING's disclosure schedules continued to reflect the additional amount of HERNANDEZ's accruals dating back to December 2015 in the outstanding amount of $165,000 (for a total of $550,000).  *See* **Exhibit "D"**.  However, no accruals were paid to DIFFENDERFER, ever.

### DIFFENDERFER Lends Her Personal Credit to NGD HOMESHARING

125.    In July 2018, while DIFFENDERFER was being told she was an independent contractor, HERNANDEZ requested that DIFFENDERFER permit NGD HOMESHARING to use DIFFENDERFER's personal credit to open a business credit card account with American Express for NGD HOMESHARING.

126.    HERNANDEZ explained to DIFFENDERFER that neither he personally nor NGD HOMESHARING could qualify for a card with American Express due to his previous defaults with the company, and that they required a different personal guarantor.

127.    DIFFENDERFER maintained excellent credit with American Express and based in large part on the trust she was told to place in HERNANDEZ, his authority over her, and her justified belief that she was going to receive the long-promised executive employment agreement for a guaranteed term, DIFFENDERFER agreed to open a credit account in her name for charges

by NGD HOMESHARING.

128.    HERNANDEZ promised DIFFENDERFER that: (a) all charges made on the credit card would be paid in full on a monthly basis so that DIFFENDERFER's credit would not be harmed, and (b) all of the travel miles and rewards earned on the card would belong exclusively to DIFFENDERFER and would not be used by NGD HOMESHARING.

129.    Based on the foregoing representations, DIFFENDERFER applied with American Express to open a business account for NGD HOMESHARING, pledging her own credit. American Express issued numerous charge cards on the account for use by NGD HOMESHARING personnel for NGD HOMESHARING expenses.

**DIFFENDERFER Begins to Suspect that Information HERNANDEZ Provided Regarding NGD HOMESHARING's Business and Finances were Not as Represented**

130.    Throughout 2018, DIFFENDERFER continued to work exclusively and exhaustively for NGD HOMESHARING, with the overarching goal of raising the next round of investment capital from Airbnb, anticipated to be between $10-15 million.

131.    However, throughout the latter half of 2018, DIFFENDERFER began to suspect that HERNANDEZ's claim in November 2017 that he made a $1.5 million personal cash investment was not as represented as the purported investment was nowhere documented in the company's financial records, and that HERNANDEZ simply inserted that figure into the 2017 Operating Agreement as a way for him to justify to DIFFENDERFER the tremendous inequity of their respective ownership interests in NGD HOMESHARING.

132.    DIFFENDERFER also began to suspect that HERNANDEZ was using NGD HOMESHARING as a marketing tool and as a means to steer real estate development business to himself through Newgard, Brookfield, other HERNANDEZ affiliated companies and other investors in NGD HOMESHARING instead of placing the property interests in NGD

HOMESHARING in accordance with HERNANDEZ's prior representations, the parties' agreement and the company's business plan as conceptualized and documented from the parties' earliest meetings in 2015.

133.    DIFFENDERFER began to grow concerned that HERNANDEZ was substituting his own, individual interests and Newgard's interests for those of NGD HOMESHARING, as HERNANDEZ's other entities owned and developed the real estate deals associated with NGD HOMESHARING, while NGD HOMESHARING incurred the costs associated with obtaining and marketing the deals, and thereafter managing and renting the properties.

134.    Over time, and particularly after she was wrongfully terminated from NGD HOMESHARING in February 2019, it became clearer to DIFFENDERFER that HERNANDEZ was using NGD HOMESHARING as a means of outsourcing certain pre-development, business development, marketing and promotional expenses for HERNANDEZ, Newgard and its affiliates.

135.    Initially, the fact that NGD HOMESHARING was assuming these expenses caused DIFFENDERFER to believe that the real estate interests and opportunities would benefit NGD HOMESHARING and not HERNANDEZ or his affiliates individually.

136.    In the latter half of 2018, Newgard expenses, made by Newgard employees who had been given copies of the NGD HOMESHARING credit card that DIFFENDERFER opened with her personal credit, began appearing on DIFFENDERFER's American Express credit card.

137.    HERNANDEZ was wrongfully commingling Newgard expenses with NGD HOMESHARING expenses and having NGD HOMESHARING pay for Newgard's expenses on DIFFENDERFER's credit card.

138.    DIFFENDERFER began to express these concerns and her perceptions to HERNANDEZ, which HERNANDEZ rejected, and as a result, in the last quarter of 2018,

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

HERNANDEZ continued to marginalize and exclude DIFFENDERFER from due diligence discussions and disclosures that were being made to potential investors.

**DIFFENDERFER Objected to Improper Payments for Barbara Salk Settlement, HERNANDEZ's Non-Disclosures to Investors and Further Objected to His Personal Retention of Salk's Equity Interest Purchased with NGD HOMESHARING's Funds**

139.    Throughout 2018, NGD HOMESHARING underwent extensive disclosures during the Series A due diligence process, in anticipation of a $10 million capital investment event scheduled to close in December 2018 for Series A funding from its principal investor to date, Airbnb.

140.    During the latter half of 2018, DIFFENDERFER learned that Salk had previously made a demand upon HERNANDEZ, Newgard and NGD HOMESHARING for, *inter alia*, HERNANDEZ's alleged breaches arising from unpaid compensation and promised equity in the Venture.

141.    The compensation that Salk claimed HERNANDEZ had promised but failed to pay her stemmed from certain agreements for services between HERNANDEZ and Newgard that Salk claimed entitled her to an equity interest in NGD HOMESHARING and other interests.

142.    HERNANDEZ hid this from DIFFENDERFER and all other investors until after he secretly reached a settlement with and made payment to Salk.

143.    DIFFENDERFER learned that in May 2018, Salk, HERNANDEZ, Newgard and NGD HOMESHARING entered into a Settlement Agreement that jointly and severally obligated NGD HOMESHARING, HERNANDEZ individually, and Newgard to pay Salk.

144.    Despite the Settlement Agreement making NGD HOMESHARING a joint and several obligor to Salk, HERNANDEZ subsequently misrepresented to DIFFENDERFER that NGD HOMESHARING owed 100% of the settlement payment to Salk.

145.     DIFFENDERFER became concerned that HERNANDEZ was causing NGD HOMESHARING to assume a disproportionate share of the payment obligation, and that he was essentially causing NGD HOMESHARING to pay for HERNANDEZ's and Newgard's liability to Salk. DIFFENDERFER also grew concerned that the Salk claim and settlement liability was not disclosed to investors, principally among them, Airbnb.

146.     In effect, HERNANDEZ caused NGD HOMESHARING to pay 100% of the Salk settlement, while HERNANDEZ thereafter kept a significant portion of Salk's presumed twenty percent (20%) ownership interest in NGD HOMESHARING's for himself.

147.     DIFFENDERFER confronted HERNANDEZ with his failure to disclose, as part of due diligence, the Salk dispute to investors, to explain why NGD HOMESHARING was liable and why HERNANDEZ received such a large portion of Salk's putative ownership interest while DIFFENDERFER received none, which caused HERNANDEZ to lash out at DIFFENDERFER, saying it was "not her business" to disclose.

148.     In response to DIFFENDERFER's objections to HERNANDEZ having extracted the excess payment from NGD HOMESHARING to cover his own liability and that of Newgard, and his failure to disclose the claim and liability to investors, HERNANDEZ threatened and then made a demand upon DIFFENDERFER.

149.     HERNANDEZ acknowledged the disproportionate payment from NGD HOMESHARING and then paradoxically demanded that DIFFENDERFER pay him personally between $100,000 and $500,000 in exchange for which HERNANDEZ would agree to cause NGD HOMESHARING to pay DIFFENDERFER her accrued "deferred compensation" owed to her as of that date. Essentially, HERNANDEZ wanted to use NGD HOMESHARING's money to pay DIFFENDERFER her accrued "deferred compensation" in order for DIFFENDERFER to then

turn around and use those same funds to pay HERNANDEZ personally; thereby once again improperly enriching HERNANDEZ at NGD HOMESHARING's and DIFFENDERFER's expense.

150.    HERNANDEZ also threatened DIFFENDERFER that she better "keep quiet" about the settlement transaction with Salk, or face termination. DIFFENDERFER refused and objected to making any personal payment and continued to oppose the improper use of NGD HOMESHARING's funds.

151.    HERNANDEZ also demanded that DIFFENDERFER give up a portion of her own equity to cover a portion of the Salk settlement payment. Specifically, HERNANDEZ demanded that DIFFENDERFER give HERNANDEZ 2.5% of DIFFENDERFER's remaining unvested membership units.

152.    When DIFFENDERFER refused the outrageous demands, HERNANDEZ temporarily dropped the issue, but then had NGD HOMESHARING's CFO ask DIFFENDERFER to give up her additional 2.5.% unvested membership units, to which DIFFENDERFER again refused.

153.    Subsequently, HERNANDEZ called DIFFENDERFER and Stamm into his office and demanded she agree to give up her additional 2.5% unvested membership units, stating that the value of the membership units would cover the Salk payment. In response to this demand, Stamm acted sincerely shocked and said he had no idea what was going on.

154.    HERNANDEZ continued with the harassing behavior over the months leading up to DIFFENDERFER's wrongful termination.

155.    At one point, to end HERNANDEZ's harassment, DIFFENDERFER offered to pay HERNANDEZ an amount equal to ten percent (10%) of the Salk settlement liability commensurate

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

with DIFFENDERFER's ten percent (10%) unvested ownership interest in NGD HOMESHARING, in exchange for which DIFFENDERFER requested to vest in ten percent (10%) of what HERNANDEZ told DIFFENDERFER would have been Salk's twenty percent (20%) ownership interest in NGD HOMESHARING had Salk not settled with her claims against the company. This would have resulted in DIFFENDERFER vesting in an additional two percent (2%) of NGD HOMESHARING issued membership units. HERNANDEZ ignored and then declined DIFFENDERFER's offer.

156.    Through the remainder of 2018, HERNANDEZ continued to irrationally demand a personal payment to himself from DIFFENDERFER to cover the Salk settlement payment, however, HERNANDEZ came to reduce his demand from DIFFENDERFER to $50,000 and threatened to discontinue her 1099 compensation if she did not adhere to that demand. DIFFENDERFER refused and maintained her objections to the manner in which HERNANDEZ dealt with her and with the Salk settlement obligation, and she insisted that HERNANDEZ provide her access to the records of the settlement and payment details, which he refused.

157.    As a result of DIFFENDERFER's objections, HERNANDEZ continued to exclude and marginalize DIFFENDERFER and her role at NGD HOMESHARING.

### DIFFENDERFER's Deferred Compensation and Employment Terms are Confirmed in Writing to Induce DIFFENDERFER to Execute a New Operating Agreement and Ancillary Transaction Documents Related to Series A Financing

158.    On December 5, 2018, DIFFENDERFER requested and was provided a written Compensation and Employment Verification letter (the "Employment Verification Letter") from NGD HOMESHARING. A true and correct copy of the Employment Verification Letter is attached hereto as **Exhibit "E"**.

159.    The Employment Verification Letter was intended to induce DIFFENDERFER to

execute a new operating agreement and ancillary transaction documents related to the Series A funding.

160.    NGD HOMESHARING's CFO signed the Employment Verification Letter, affirming that "Diffenderfer is currently the Co-Founder and Chief Marketing Officer of NGD Homesharing, LLC with offices in Miami and real estate holdings in Kissimmee, FL and Nashville. The company was founded in December of 2015 by Diffenderfer and the companies [sic] CEO, Harvey Hernandez." *See* **Exhibit "E"**. Newgard's and NGD HOMESHARING's general counsel, Stamm, provided DIFFENDERFER a nearly identical letter that Stamm had signed.

161.    The Verification letter also confirmed DIFFENDERFER's employment status, reflecting the terms of the long-promised employment agreement, and expressly restated that DIFFENDERFER had been accruing "deferred compensation" of "$10,833.33 per month to be distributed January 1, 2019, at which point she will convert from a 1099 to a W-2 employee at the annual salaried rate of $250,000."  *See* **Exhibit "E"**.

### HERNANDEZ Extracts Key Intellectual Property, Plans, Signatures and Documents from DIFFENDERFER on False Pretenses in Preparation for Her Ouster

162.    Starting on November 1, 2018, in anticipation of the Series A event, upon which DIFFENDERFER was affirmatively led to believe she would receive payment of her accrued "deferred compensation" as well as her long-promised employment contract for a guaranteed term, HERNANDEZ approached DIFFENDERFER and requested that she prepare and compile a comprehensive business, marketing and financial plan for NGD HOMESHARING.

163.    As requested, on December 4, 2018, DIFFENDERFER delivered to HERNANDEZ a 70-page document drawn in large part from dozens of her prior business and financial model iterations, and presented HERNANDEZ with detailed financial modeling, a detailed organizational and operational plan, as well as key information about all aspects of Niido's

website, app structure and development, relationships with consultants and creative agencies, among other things.

164.    Once  HERNANDEZ  had  extracted  these  ideas  and  documents  from DIFFENDERFER, he began to make demands on DIFFENDERFER for her to sign various agreements in connection with the Series A funding transaction.

165.    In December 2018, over DIFFENDERFER's express objections, HERNANDEZ instructed DIFFENDERFER to sign and backdate by three years, to December 2, 2015, a "Consultant  Non-Disclosure,  Non-Disparagement  and  Non-Solicitation  Agreement"  (the "Backdated Agreement") in favor of NGD HOMESHARING.  A true and correct copy of the Backdated Agreement is attached as **Exhibit "F"**.

166.    NGD HOMESHARING, LLC did not even exist in December 2015, since its Articles of Organization were not filed until September 2016.

167.    HERNANDEZ instructed DIFFENDERFER that in connection with the Series A funding, and as the final condition to her receiving a payout of her accrued "deferred compensation" and a written executive employment agreement, that she needed to sign and date the Backdated Agreement as of December 2, 2015. HERNANDEZ thereafter caused his own signature to be placed on the document as CEO on behalf of NGD HOMESHARING backdated to December 2, 2015.

168.    Fearing the threats and intimidation tactics HERNANDEZ had previously used against DIFFENDERFER including the threat that her refusal would be seen as "tortuously interfering" with an advantageous investment relationship, being fully-aware that HERNANDEZ would cause NGD HOMESHARING to not pay DIFFENDERFER her accrued "deferred compensation" and would not provide the long-promised executive employment agreement if she

refused to sign, DIFFENDERFER executed and dated the Backdated Document under protest.

169. On the Backdated Agreement, appearing before the parties' signatures, reference is made to the "Defend Trade Secrets Act of 2016", which was enacted by Congress in May 2016, five months after the Backdated Agreement referencing the Act purports to have been executed. *See* **Exhibit "F"**.

170. Unbeknownst to DIFFENDERFER at the time, December 2, 2015 was the same date that HERNANDEZ chose to falsely use when he manufactured and backdated his own "Letter of Engagement" with NGD HOMESHARING in 2018, on which HERNANDEZ based his own claim to accrued deferred compensation in the amount of $15,000 / month dating back to December 2015. *See* **Exhibit "G"**. Although it is true that both DIFFENDERFER and HERNANDEZ agreed in December 2015 they would each receive, defer and accrue an annual salary of $250,000 beginning at that time, and although it is true that HERNANDEZ repeatedly affirmed that agreement with DIFFENDERFER as she continued to devote her full time efforts for years without receiving any payments; neither of them signed any documents reflecting their agreement and certainly did not do so on NGD HOMESHARING letterhead in December 2015 as the company was not formed until September 2016.

171. HERNANDEZ manufactured and backdated his false "Letter of Engagement" in late-2018 so that it could be referenced as an authentic document on the aforementioned disclosure schedules (**Exhibit "D"**) produced by HERNANDEZ to close the Series A funding, showing his accrued deferred compensation as a documented liability of NGD HOMESHARING. The manufactured and backdated "Letter of Engagement" reflects it was mailed to HERNANDEZ at his residence located at 1451 Brickell Ave. Apt. 5001 Miami, FL 33131, an apartment building that was not constructed until 2017.

172.    Despite HERNANDEZ's representations regarding DIFFENDERFER's long-promised executive employment agreement and impending payout of DIFFENDERFER's accrued deferred compensation, no new or additional consideration was given to DIFFENDERFER in exchange for her signature on the Backdated Agreement.

173.    Later in December 2018, DIFFENDERFER was presented with yet another Amended and Restated Operating Agreement for her prompt signature before the end of December 2018 (the "2019 Operating Agreement"). The 2019 Operating Agreement contained numerous objectionable provisions regarding DIFFENDERFER's membership interest.

174.    In the initial version provided to DIFFENDERFER, both she and the COO had been removed from the sections of the document that listed the Officers, indicating that the plan to terminate them was already underway and that initially they were to have been terminated prior to closing the Series A funding.

175.    When DIFFENDERFER questioned why she was not listed as an Officer, she was told it was a simple mistake and she would be re-added.

176.    Both DIFFENDERFER and the COO were terminated shortly after the Series A funding closed.

177.    In the revised version of the 2019 Operating Agreement that re-listed DIFFENDERFER as an Officer, despite DIFFENDERFER's repeated objections, HERNANDEZ again changed DIFFENDERFER's vesting schedule and he removed DIFFENDERFER's anti-dilution protection.

178.    Specifically, the language used in DIFFENDERFER's vesting schedule in Section 13.18 of the 2017 Operating Agreement provided DIFFENDERFER with anti-dilution protection, such that in the event additional units issued to investors under the 2017 Operating Agreement,

DIFFENDERFER would have been issued sufficient additional units to ensure that her ownership interest as a percentage of all outstanding units would equate to seven and one-half percent (7.5%) of issued units as of the first anniversary of executing the 2017 Operating Agreement and ten percent (10%) of issued units as of the second anniversary.[2] In the 2019 Operating Agreement, DIFFENDERFER's anti-dilution protection was removed and the language used in Section 14.18 therein to describe DIFFENDERFER's ownership interest changed from a percentage interest to a set number of units,[3] thereby subjecting DIFFENDERFER to dilution.

179.   The change in DIFFENDERFER's stock vesting schedule by HERNANDEZ is in violation of HERNANDEZ' duties owed to DIFFENDERFER, including *inter alia* those duties owed as the majority member and manager of NGD HOMESHARING.   By changing the

---

[2]     2017 Operating Agreement: Section 13.18 Diffenderfer Unit Vesting. Diffenderfer shall receive additional Class A Units pursuant to the following terms and conditions: (a) In order to be eligible to receive any Units pursuant to this Section 13.18, the Class A Majority shall have determined, in its good faith reasonable discretion, that Diffenderfer shall have dedicated substantially all of her time to the to the business of the Company, and shall not have engaged in any other business venture other than for a period of de minimis time. (b) Assuming the conditions of Section 13.18(a) shall have been fulfilled, on the one (1) year anniversary of the Effective Date, the Company shall issue Class A Units to Diffenderfer such that Diffenderfer shall, following such issuance, own 7.5% of the issued and outstanding Class A Units. (c) Assuming the conditions of Section 13.18(a) shall have been fulfilled, on the two (2) year anniversary of the Effective Date, the Company shall issue Class A Units to Diffenderfer such that Diffenderfer shall, following such issuance, own 10% of the issued and outstanding Class A Units. (emphasis added).

[3]     2019 Operating Agreement: Section 14.18 Diffenderfer Unit Vesting. Cindy Diffenderfer has the right to receive up to an aggregate of 650,000 Class A Units (as adjusted for recapitalizations, splits and the like) as set forth below: (a) In order to be eligible to receive any Class A Units pursuant to this Section 14.18, the Majority Members shall have determined, in its good faith reasonable discretion, that Diffenderfer shall have dedicated substantially all of her time to the to the business of the Company, and shall not have engaged in any other business venture other than for a period of de minimis time. (b) Assuming the conditions of Section 14.18(a) shall have been fulfilled as of such date, on November 29, 2018, the Company shall issue 487,500 Class A Units to Diffenderfer. (c) Assuming the conditions of Section 14.18(a) shall have been fulfilled as of such date, on November 29, 2019, the Company shall issue Class A Units to Diffenderfer such that Diffenderfer shall, following such issuance, [sic] 162,500 Class A Units to Diffenderfer. (emphasis added).

terminology of DIFFENDERFER's vesting schedule in the 2019 Operating Agreement, HERNANDEZ uniquely harmed DIFFENDERFER by reducing her ownership interest and subjecting it to further dilution to further his own interests and without a legitimate business purpose.

180.    Once again, like the 2017 Operating Agreement, the 2019 Operating Agreement also contemplated and treated DIFFENDERFER as an employee – as opposed to an independent contractor – of NGD HOMESHARING as it required her to dedicate "substantially all of her time to the to the business of the Company, and [] not [] engage[] in any other business venture other than for a period of de minimis time" in order for her equity interests to vest. A true and correct copy of relevant pages of 2019 Operating Agreement are attached as **Exhibit "H"**.

181.    DIFFENDERFER contested HERNANDEZ's authority to make these significant and material changes and was met with aggression and condescension.

182.    Newgard's and NGD HOMESHARING's CFO, general counsel Stamm, and HERNANDEZ called, texted and emailed DIFFENDERFER on Christmas Eve, Christmas Day and New Year's Eve with constantly moving deadlines to induce DIFFENDERFER to sign agreements that were detrimental to her.

183.    DIFFENDERFER tried to negotiate terms in the 2019 Operating Agreement, but all her requests were rejected. She then tried to delay signing the 2019 Operating Agreement until she secured her long-promised written executive employment agreement, which by that point had been negotiated, drafted and agreed but not executed, as well as payout of her accrued "deferred compensation" based upon HERNANDEZ's and NGD HOMESHARING's numerous representations that the employment agreement and payout would be forthcoming once the Series A funding closed.

184.   When confronted with DIFFENDERFER's demand that she receive her written employment agreement and confirm payout of her accrued deferred compensation before she would execute the "take it or leave it" 2019 Operating Agreement, HERNANDEZ simply had DIFFENDEFER's signature-block removed from the 2019 Operating Agreement. *See* **Exhibit "H"**. HERNANDEZ told DIFFENDERFER that based on the language of the 2017 Operating Agreement, DIFFENDERFER's signature was unnecessary on the 2019 Operating Agreement because her percentage of ownership and corresponding ability to vote her membership units were too small to prevent the 2019 Operating Agreement from taking effect.

185.   Although the investment funds were received by NGD HOMESHARING in December 2018, the Series A event was slightly delayed by HERNANDEZ and other parties and did not close until January 4, 2019.

186.   To present date, DIFFENDERFER has never executed the 2019 Operating Agreement. Nonetheless, the 2019 Operating Agreement was signed by the other equity members and given an effective date of January 4, 2019. *See* **Exhibit "H"**.

187.   The 2019 Operating Agreement creates a Board of Managers that shall manage the business and affairs of NGD HOMESHARING. At all times material, HERNANDEZ was the only member of the Board of Managers.

188.   Like the 2017 Operating Agreement, the 2019 Operating Agreement includes exculpatory language intended to waive statutory and common law fiduciary duties owed to DIFFENDERFER in Article VII, which language is manifestly unreasonable, particularly under the circumstances present here.

189.   Also, like the 2017 Operating Agreement, the 2019 Operating Agreement contains a Section titled "Restrictive Covenants". Specifically, Section 4.13 therein reads:

Section 4.13 <u>Restrictive Covenants</u>.

(a) As a material inducement to the Company and to each other Member to enter into this Agreement, each Member (other than Airbnb and Brookfield and their respective Affiliates) agrees that, for so long as such Member remains a Member and for a period of 18 months following the date on which such Member ceases to be a Member, such Member shall not, and shall cause his, her or its Affiliates not to, directly or indirectly:

(i) own any interest in, manage, control, participate in, consult with, render services for (as a director, officer, employee, agent, broker, partner, contractor, consultant or otherwise) or be or become engaged or involved in any Restricted Business within the Restricted Territory, including by being or becoming an organizer, owner, co-owner, trustee, promoter, Affiliate, investor, lender, partner, joint venture, stockholder, officer, director, employee, independent contractor, manager, salesperson, representative, associate, consultant, agent, broker, supplier, licensor, analyst or advisor of, to or with any Restricted Business;

(ii) make any investment (whether equity, debt or otherwise) in, lend or otherwise provide any money or assets to, or provide any guaranty or other financial assistance to any Restricted Business within the Restricted Territory; or

(iii) provide any information, assistance, support, product, technology or intellectual property to any Person engaged or involved in any Restricted Business within the Restricted Territory.

(b) Notwithstanding anything to the contrary in Section 4.13(a), a Member may, directly or indirectly, own, solely as an investment, the equity securities of any corporation engaged in the Restricted Business which are publicly traded on a national or regional stock exchange or on the over-the-counter market, but only if such Member (i) is not a controlling person of, or a member of a group which controls, such corporation, (ii) does not directly or indirectly own more than one percent (1%) of any class of securities of such corporation, and (iii) does not undertake any of the activities contemplated by Section 4.13(a) above (other than the purchase of such equity securities) and otherwise has no active participation in the business of such corporation.

190.    As with the 2017 Operating Agreement, the 2019 Operating Agreement defines "Restricted Business" as "any business, activity, enterprise or venture that, directly or indirectly (including through any partnership, limited liability company, corporation, joint venture or similar

arrangement (whether now existing or formed hereafter)), conducts activities or provides products or services of the type conducted, offered or provided, or presently proposed to be conducted, offered or provided by the Company from time to time."  Similarly, the term "Restricted Territory" is defined as "the United States of America." *See* **Exhibit "H"**.

191.    As under the 2017 Operating Agreement, the Restrictive Covenants under the 2019 Operating Agreement are arbitrarily and selectively enforced and are waived, released and ignored with respect to numerous members and executives of NGD HOMESHARING, including HERNANDEZ.

192.    In early 2019, based on HERNANDEZ's promise that if DIFFENDERFER signed one last additional ancillary transaction document relating to intellectual property rights that she would receive the long-promised written employment agreement and accrued deferred compensation, and under the threat that if she did not sign the document she would be terminated that same day without receiving her accrued compensation; under protest, DIFFENDERFER executed a "Confirmatory Assignment Agreement" dated January 21, 2019 (the "IP Assignment Agreement").  A true and correct copy of the January 21, 2019 IP Assignment Agreement is attached as **Exhibit "I"**.

193.    The IP Assignment Agreement purported to disclaim and assign to NGD HOMESHARING any rights DIFFENDERFER may have to the company's intellectual property, including the business plan, web site and app-architecture and related proprietary works that DIFFENDERFER created even before NGD HOMESHARING existed.  *See* **Exhibit "I"**.

**DIFFENDERFER is Summarily Demoted as a Plan to Have Her Quit, then Her "Employment" was Terminated without Cause, and Her Personal Computer Data was Improperly Accessed and Misappropriated**

194.    On January 31, 2019, a mere ten days after HERNANDEZ induced

DIFFENDERFER to execute the IP Assignment Agreement, HERNANDEZ abruptly informed DIFFENDERFER that effective March 1, 2019 she would no longer serve as Chief Marketing Officer, as he had already hired a replacement unbeknownst to DIFFENDERFER and the rest of the leadership team.

195.     Thereafter DIFFENDERFER's interactions and discussions with HERNANDEZ deteriorated significantly and he: (a) ignored her inquiries regarding his delay in executing her executive employment agreement that he and NGD HOMESHARING had long promised, negotiated, drafted, represented would be forthcoming as of January 2019, and which was used to induce DIFFENDERFER's execution of the IP Assignment Agreement and Backdated Agreement, and (b) did not start compensating her at the rate of $250,000 / year plus benefits, but instead stopped paying her altogether without informing her that her payment of $10,000 / month would not be made for February 2019.

196.     Nor was DIFFENDERFER paid the salary accruals of "deferred compensation" from December 2015 through December 2019 that were due to be paid in January 2019 as represented to DIFFENDERFER in writing by CFO Zimmerman and General Counsel Stamm on December 5, 2018 in the Employment Verification Letters provided by those NGD HOMESHARING representatives, and innumerable times verbally both prior and subsequent thereto by HERNANDEZ.

197.     While HERNANDEZ was demeaning and aggressive toward DIFFENDERFER, he simultaneously ignored her requests to know why she had not received the money and agreement that was promised to her and he continued to marginalize and remove her from NGD HOMESHARING's operations.  He did this by "promoting" DIFFENDERFER into obsolesces and giving her a made-up title that HERNANDEZ had no intention of holding any responsibility,

hoping DIFFENDERFER would grow frustrated and quit.  To that end, on February 15, 2019, HERNANDEZ caused an Investor Update Newsletter to issue explaining to investors why they would be hearing and seeing even less of his co-founder, DIFFENDERFER, stating:

> Our Co-founder and CMO, Cindy Diffenderfer will be promoted into a new role as Chief Impact Officer and Head of Corporate Culture.
>
> This role will have overall strategic and operational responsibility for ensuring an integrated approach to social and community impact efforts. As CIO, Cindy will provide inspirational leadership to develop and implement efforts to advance the company's goals and solutions with a focus on philanthropic initiatives and community leadership. The position will be part of the senior leadership team that drives the overall strategy for the organization.
>
> As the CIO, she will oversee the development and implementation for advancing community impact, including: convening partners, building coalitions, forging common agendas, organizing community awareness, initiating grants and leveraging resources focused at providing affordable housing in the communities we operate and beyond.
>
> Cindy will continue to work closely with the CEO, in close collaboration with the organization's C-suite and leadership at Airbnb's Social Impact teams. She will also guide the creation and maintenance of the company's Corporate Culture. She will oversee brand training, team on-boarding and on-going employee engagement programming to establish an environment people thrive in and build a company people aspire to work for. She will coach and inspire others to build brand affinity within their teams, partners and throughout our communities.
>
> *See* **Exhibit "J"**.

198.     Just four days later, on February 19, 2019, at 4:55pm, HERNANDEZ formally terminated DIFFENDERFER's "employment" with NGD HOMESHARING without prior notice or cause and she was presented with a written employment termination letter.  *See* February 19, 2019 "Termination of Employment" letter once again informing DIFFENDERFER that the company intended to enforce the Restrictive Covenants against her, attached as **Exhibit "K"**.

199.    DIFFENDERFER was escorted out of NGD HOMESHARING's offices while her company-issued laptop and other personal items were confiscated and were never returned to her possession.

200.    NGD HOMESHARING owes DIFFENDERFER her employment compensation through February 19, 2019. Notably, while other members of the executive team including CFO Seth Zimmerman, CTO Todd Butler, the COO, and the newly hired CMO Kim Walker each received cash bonuses in excess of $50,000.00 following the Series A funding, DIFFENDERFER did not receive any compensation and then had her employment terminated.

201.    Shortly after being escorted out of the building, DIFFENDERFER discovered that NGD HOMESHARING, through its agents and representatives, not only accessed all business-related files and emails contained on her company-issued laptop, but also used her computer and her personal access passwords that were linked to her icloud account to improperly access, misappropriate, manipulate, delete, corrupt and/or destroy DIFFENDERFER's individual, personal files stored on the laptop and on web-based accounts and servers, including emails, and files stored in her personal account with Dropbox, the web-based file hosting service.

202.    Many of the destroyed personal files pertained to DIFFENDERFER's other investments and projects unrelated to NGD HOMESHARING and included key business and personal financial documents and other records that are irreplaceable.

203.    Of significance, NGD HOMESHARING, by accessing DIFFENDERFER's records, had access to her attorney-client correspondence and work-product, not only for this instant dispute, but for other personal dealings with attorneys outside the interests of NGD HOMESHARING.

204.    DIFFENDERFER has attempted to but has been unable to restore her personal

Dropbox files, which are no longer accessible due to NGD HOMESHARING's unlawful actions.

**DIFFENDERFER's Credit Damaged Due to Late and
Missed Credit Card Payments by NGD HOMESHARING**

205.    Following her termination, DIFFENDERFER attempted to access her American Express credit account online, and learned that NGD HOMESHARING, through its agents or representatives, had removed her as an authorized user on her own credit card account, even though it was her personal credit that was being used to maintain the account for NGD HOMESHARING.

206.    DIFFENDERFER learned that there was a large outstanding unpaid balance that had remained on the account for several months, and that NGD HOMESHARING had failed to make timely monthly payments on the account.  This was not only contrary to her credit agreement with American Express but was also contrary to her verbal agreement with HERNANDEZ and NGD HOMESHARING when she agreed to lend her credit for NGD HOMESHARING's use and benefit.

207.    Due to NGD HOMESHARING's failure to timely pay the monthly balances on the American Express account, which was reported to the major credit reporting agencies, DIFFENDERFER's credit was negatively impacted and damaged due to the breach of the oral agreement to timely pay all balances owed on the account.

**COUNT I:
UNPAID WAGES AND ACCRUALS FROM DECEMBER 2015 THROUGH FEBRUARY
19, 2019– BREACH OF EMPLOYMENT AGREEMENT
-Against NGD HOMESHARING and HERNANDEZ-**

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

208.    DIFFENDERFER performed work and provided services as a misclassified employee for HERNANDEZ and NGD HOMESHARING as described above, including by serving as NGD HOMESHARING's Chief Marketing Officer.

209.    At all material times, DIFFENDERFER was employed by HERNANDEZ and NGD HOMESHARING under an oral employment agreement.

210.    Commencing December 2015, while HERNANDEZ was promoting the Venture that eventually became NGD HOMESHARING, HERNANDEZ, as the managing agent of their partnership and as the prospective majority member and manager of NGD HOMESHARING, extended an oral agreement to DIFFENDERFER for her employment at the rate of $250,000 annually, conditioned upon payout of the annual salary being deferred and accruing until certain fundraising benchmarks were met.

211.    DIFFENDERFER accepted HERNANDEZ's offer of employment and devoted her full-time and best efforts to the Venture that became known as NGD HOMESHARING.

212.    HERNANDEZ also told DIFFENDERFER that he too was deferring his own compensation in connection with the Venture and that his annual salary was also $250,000 and it too would accrue and be paid once certain fundraising benchmarks were met.

213.    As DIFFENDERFER later discovered, HERNANDEZ represented in writing to Airbnb that he would be paying and/or had paid himself his deferred accrued compensation for this same period.

214.    Commencing December 1, 2017, after an initial fundraising target had been achieved, HERNANDEZ caused NGD HOMESHARING to pay DIFFENDERFER a portion of her annual salary in the amount of $10,000.00 per month, and represented to DIFFENDERFER

that the remaining $10,833.33 per month of back wages would continue to accrue each month and would be added to the accruals that DIFFENDERFER had been deferring since December 2015.

215.    HERNANDEZ told DIFFENDERFER that she would be paid as an independent contractor and therefore the $10,000 per month that would be paid as an un-deferred portion of her agreed to annual salary would be 1099 income.

216.    One year later, in December 2018, the December 2015 oral employment agreement was confirmed in writing in an Employment Verification Letter sent by NGD HOMESHARING's CFO and general counsel Stamm to DIFFENDERFER.  *See* **Exhibit "E"**.

217.    In the Employment Verification Letter, NGD HOMESHARING confirms the agreement to compensate DIFFENDERFER with an annual salary of $250,000, and further represented that only $10,000 per month was then being paid to DIFFENDERFER with the remaining portion of her salary accruing and to be paid out in January 1, 2019.  *See Id.*

218.    In early 2019, after closing on the Series A funding, as the manager and majority member of NGD HOMESHARING, HERNANDEZ caused NGD HOMESHARING to pay himself more than $550,000 of his own accrued compensation going back to December 2015. Additionally, HERNANDEZ caused NGD HOMESHARING to record on its books and records as of January 4, 2019 an additional liability owed to HERNANDEZ for his outstanding accruals of deferred compensation of more than $160,000.

219.    Dissimilarly, in early 2019, after closing on the Series A funding, as the Manager and majority member of NGD HOMESHARING, HERNANDEZ caused NGD HOMESHARING to refuse to pay DIFFENDERFER any of her accrued deferred compensation going back to December 2015 and terminated her without further compensation.

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

220.    At the time of her termination on February 19, 2019, NGD HOMESHARING had paid DIFFENDERFER the $10,000 monthly payments from December 2017 through January 2019, for a total of $140,000 of what NGD HOMESHARING treated as 1099 income.

221.    NGD HOMESHARING failed to pay DIFFENDERFER any of the accrued W2 wages she was owed from December 2015 up to and through February 19, 2019 at the agreed upon amount of $250,000.00 annually, less the amounts DIFFENDERFER received as 1099 income of $10,000 per month from December 2017 to January 2019.

222.    Further, NGD HOMESHARING failed to pay DIFFENDERFER any part of the $10,000 monthly portion of her salary for February 1, 2019 through the date she was terminated on February 19, 2019.

223.    HERNANDEZ's and NGD HOMESHARING's refusal and failure to compensate DIFFENDERFER in full for all compensation and wages owed was in violation of the laws of the State of Florida for the performance of her services.

224.    DIFFENDERFER has suffered, and continues to suffer, damages as a result of this failure to pay all compensation and wages owed.

225.    Additionally, by misclassifying DIFFENDERFER as an independent contractor, NGD HOMESHARING is liable for back taxes paid by DIFFENDERFER as a misclassified 1099 contractor that should have been paid by her employer, as well as for all employee benefits which she was improperly denied, including without limitation health insurance, automobile allowances, severance compensation payable to other executive employees of NGD HOMESHARING who are terminated without cause, and participation in any qualified or unqualified Employee Stock Ownership Plans maintained by NGD HOMESHARING.

226.     Pursuant to Florida Statutes §448.08, DIFFENDERFER is entitled to recover costs of suit and reasonable attorney's fees.

WHEREFORE, DIFFENDERFER demands entry of a judgment in her favor against HERNANDEZ and NGD HOMESHARING for unpaid wages, pre-judgment interest, and attorneys' fees pursuant to Fla. Stat. § 448.08, and any and all other relief that the Court deems just and proper.

<u>COUNT II:</u>
**UNPAID WAGES AND ACCRUALS FROM DECEMBER 2015 THROUGH FEBRUARY 19, 2019 – UNJUST ENRICHMENT**
-Against NGD HOMESHARING and HERNANDEZ-

Plaintiff DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

227.     DIFFENDERFER performed work and provided services for HERNANDEZ and NGD HOMESHARING as described above, including by serving as NGD HOMESHARING's Co-Founder and Chief Marketing Officer.

228.     Since at least December 2015 to February 19, 2019, DIFFENDERFER devoted her full-time and best efforts to the Venture and ultimately to NGD HOMESHARING, fulfilling numerous duties, materially and directly furthering HERNANDEZ's and NGD HOMESHARING's success.

229.     Both HERNANDEZ and NGD HOMESHARING have accepted and retained the benefit conferred by DIFFENDERFER's services.

230.     In December 2015, HERNANDEZ and DIFFENDERFER agreed the fair value of DIFFENDERFER's services was $250,000 annually.

231.     Commencing December 1, 2017, after an initial fundraising target had been achieved, HERNANDEZ caused NGD HOMESHARING to pay DIFFENDERFER a portion of

the fair value of her services in the amount of $10,000 per month, and represented to DIFFENDERFER that the remaining portion of the fair value for her services ($10,833.33 per month) would continue to accrue each month and would be added to the accruals that DIFFENDERFER had been deferring as fair value for her services since December 2015.

232.    In December 2017, HERNANDEZ told DIFFENDERFER that she would be paid as an independent contractor and therefore the $10,000 per month that would be paid as an un-deferred portion of the fair value for her services would be treated as 1099 income.

233.    One year later, in December 2018, NGD HOMESHARING re-confirmed in an Employment Verification Letter that the fair value of the services that DIFFENDERFER had been performing since December 2015 was $250,000 annually and that DIFFENDERFER had been accruing the un-paid portion of the fair value for her services since that time.  *See* **Exhibit "E"**.

234.    In early 2019, after closing on the Series A funding, HERNANDEZ caused NGD HOMESHARING to pay himself his own accrued compensation going back to December 2015.

235.    Dissimilarly, in early 2019, after closing on the Series A funding, HERNANDEZ caused NGD HOMESHARING to terminate DIFFENDERFER, refusing to pay DIFFENDERFER any of the accrued un-paid portion of the fair value for her services.

236.    HERNANDEZ's and NGD HOMESHARING's refusal and failure to compensate DIFFENDERFER in full for the fair value of her services was in violation of the laws of the State of Florida.

237.    DIFFENDERFER has suffered, and continues to suffer, damages as a result of this failure to pay the compensation and wages owed.

238.   The circumstances render the HERNANDEZ's and NGD HOMESHARING's retention of the benefit of DIFFENDERFER's inequitable unless DIFFENDERFER is paid the full fair value of her services.

239.   Pursuant to Florida Statutes §448.08, DIFFENDERFER is entitled to recover costs of suit and reasonable attorney's fees.

WHEREFORE, DIFFENERFER demands entry of a judgment in her favor against HERNANDEZ and NGD HOMESHARING for unpaid accrued portion of the fair value for her services, of pre-judgment interest, and attorneys' fees pursuant to Fla. Stat. § 448.08, and any and all other relief that the Court deems just and proper.

## COUNT III:
### BREACH OF FIDUCIARY DUTIES
-Against HARVEY HERNANDEZ-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

240.   HERNANDEZ has continually owed on-going fiduciary duties to DIFFENDERFER starting *inter alia*: (a) in August 2015 as DIFFENDERFER's friend, confidant and business partner who he requested DIFFENDERFER place her trust and confidence in as they formed a partnership of which HERNANDEZ served as the managing agent, which later became known as NGD HOMESHARING; then (b) in September 2016 as the self-appointed Manager of NGD HOMESHARING; then (c) in November 2017 as the self-appointed Supermajority Member and *de facto* sole controlling interest and Manager of NGD HOMESHARING; and subsequently (d) in January 2019, as the sole member of the Board of Managers while remaining the self-appointed majority member of NGD HOMESHARING.

241.    The on-going fiduciary duties gave rights to DIFFENDERFER and obligated HERNANDEZ to, *inter alia*: (a) account for the partnership/company and hold as trustee for the partnership/company any property, profit, or benefit derived by the partner in the conduct or derived from a use by the partner of partnership/company property, including the appropriation of a partnership/company opportunity; (b) refrain from dealing with the partnership/company in the conduct of the partnership/company business as or on behalf of a party having an interest adverse to the partnership/company; (c) refrain from competing with the partnership/company in the conduct of the partnership/company business before the dissolution of the partnership/company; (d) refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law; (e) have complete candor in disclosing fully all of the facts and circumstances surrounding a transaction involving DIFFENDERFER as his partner/minority member; (f) act with loyalty and care; and (g) not engage in oppressive acts and self-dealing to the unique (and not derivative) detriment of DIFFENDERFER, specifically pertaining to DIFFENDERFER's right to receive her full, equitable, vested ownership interest in NGD HOMESHARING that was deceptively taken from her, her right to receive accrued deferred compensation, and her right to not be wrongfully discriminated against and terminated from her position with NGD HOMESHARING.

242.    Since December 2015, the unequal power and bargaining positions that existed between HERNANDEZ and DIFFENDERFER have made DIFFENDERFER dependent on HERNANDEZ for, *inter alia*, determining: (a) when and how much compensation she would be paid; (b) when and how much of an ownership interest she would receive in the Venture that DIFFENDERFER co-founded and spent nearly four years successfully developing, for most of which time she went without any compensation; and (c) what information DIFFENDERFER

would be given access to regarding the Venture she co-founded, including its finances, operation and key decision making.

243.   Since they began working on the Venture together, on numerous occasions HERNANDEZ requested DIFFENDERFER place her trust in him, which she did, and HERNANDEZ accepted that trust and undertook to protect and benefit DIFFENDERFER using his superior position of authority and control over her compensation, employment, ownership interest and access to information regarding the Venture that became known as NGD HOMESHARING.

244.   HERNANDEZ breached his fiduciary duties as, *inter alia*:

    a.  HERNANDEZ misrepresented to DIFFENDERFER, and otherwise failed to disclose when there was a duty to do so, that as of November 29, 2017, he had not actually contributed cash in the amount of $1.5 million to NGD HOMESHARING, which was the reason HERNANDEZ gave DIFFENDERFER for the widely disparate ownership interests between them as reflected in the 2017 Operating Agreement. Had HERNANDEZ accurately disclosed his cash contribution, DIFFENDERFER would have offered to match his contribution for an equal ownership interest in NGD HOMESHARING or she would have demanded a larger equity interest for herself based on her substantial contribution to the Venture relative to HERNANDEZ's as of November 29, 2017.

    b.  HERNANDEZ surreptitiously altered DIFFENDERFER's vesting schedule in the final 2017 Operating Agreement, making DIFFENDERFER's entire equity interest contingent and subject to a two-year vesting schedule. Thereafter, HERNANDEZ forced DIFFENDERFER to execute the 2017 Operating Agreement under duress demanding she immediately execute the 46-page single space agreement with virtually no time to review or consult an attorney regarding the document, while threatening DIFFENDERFER that her refusal to immediately sign the document would result in her termination, loss of her ownership interest and potentially create liability for her by interfering with NGD HOMESHARING's an advantageous investment relationship. In addition to the lost value of her ownership interest caused by these breaches, by not immediately vesting in any portion of her ownership interest, DIFFENDERFER was also harmed as she: (i) suffered an adverse tax consequence by not being able to share in the loss NGD HOMESHARING reported in 2017 when she filed her personal tax return as she was not a member until 2018; (ii) was not permitted to inspect NGD HOMESHARING's books and records until at least November

29, 2018 as she was not a member until she partially vested on that date, preventing DIFFENDERFER from learning the actual financial affairs and dealings of the company sooner than that time; and (iii) was excluded from various related real estate investment opportunities that were made available to other vested members of NGD HOMESHARING in proportion to their vested percentage interests, on the basis that because her ownership interest did not vest she was not permitted to participate in the investment opportunities at any level.

c.  HERNANDEZ misrepresented to DIFFENDERFER, and otherwise failed to disclose when there was a duty to do so, that: (i) Salk made claims against NGD HOMESHARING and HERNANDEZ relating to the period when HERNANDEZ, Salk and DIFFENDERFER were the sole partners in the Venture; (ii) NGD HOMESHARING was solely liable for a settlement payment owed to Salk; (iii) that HERNANDEZ was using NGD HOMESHARING's funds to settle with Salk so that HERNANDEZ could personally acquire Salk's equity interest for himself and to the exclusion of DIFFENDERFER; and (iv) using HERNANDEZ's position of control over NGD HOMESHARING to demand that DIFFENDERFER personally pay HERNANDEZ money or give HERNANDEZ DIFFENDERFER's right to her unvested equity interest in exchange for HERNANDEZ causing NGD HOMESHARING to payout DIFFENDERFER's accrued "deferred compensation".

d.  HERNANDEZ surreptitiously waived, released, excluded and otherwise ignored numerous executives, investors and himself from complying with the Restrictive Covenants in the 2017 and 2019 Operating Agreements and from other similar restrictive covenants, statutory and common law duties of loyalty, permitting himself and his favored executives and investors who provide HERNANDEZ with a personal benefit the ability to compete with and engage in disloyal acts against NGD HOMESHARING while simultaneously and oppressively seeking to bind DIFFENDERFER to such Restrictive Covenants and repeatedly threatening to enforce those covenants and duties against DIFFENDERFER without a legitimate business purpose or legitimate business interest to protect, in order to gain leverage over DIFFENDERFER to further weaken her position and to extract additional concessions from DIFFENDERFER for HERNANDEZ's personal benefit.

e.  HERNANDEZ misrepresented to DIFFENDERFER, and otherwise failed to disclose when there was a duty to do so, that DIFFENDERFER had a right to reserve one or more condominium units at the pre-market "Friends and Family" rate, which on information and belief HERNANDEZ took advantage of for himself and extended to other members of NGD HOMESHARING in the company's two new development projects, Natiivo Austin and Natiivo Miami.

f.   Prior to DIFFENDERFER's execution of the IP Assignment and the Backdated Agreement, HERNANDEZ unilaterally resolved and decided to terminate DIFFENDERFER's position and services for NGD HOMESHARING with the specific intent to disavow the many promises to DIFFENDERFER, including those regarding payment of "deferred compensation" and promised executive employment agreement. For several months, HERNANDEZ intentionally withheld and actively secreted his termination decision from DIFFENDERFER, and strung DIFFENDERFER along and intentionally caused DIFFENDERFER to rely upon his promises as a means of procuring additional concessions from DIFFENDERFER.   HERNANDEZ caused DIFFENDERFER to waive significant and valuable rights, claims and entitlements, and procured DIFFENDERFER's signature on the January 21, 2019 IP Assignment, and the December 2018 Backdated Agreement, to her detriment.

g.   HERNANDEZ used his position of control over NGD HOMESHARING to refuse to pay DIFFENDERFER the accrued "deferred compensation" that she was repeatedly promised since December 2015 (including in writing in December 2018), while HERNANDEZ caused NGD HOMESHARING to pay his own deferred compensation for that same period, all as part of HERNANDEZ's ongoing efforts to cause DIFFENDERFER to resign so she would not vest in her unvested membership units in accordance with Section 14.18 of the 2019 Operating Agreement and so he could pay himself with DIFFENDERFER's unpaid accrued "deferred compensation".

h.   HERNANDEZ used his position of control over NGD HOMESHARING to subject DIFFENDERFER to oppressive, harassing, bullying and demeaning conduct so she would resign her role at NGD HOMESHARING and give up her unvested ownership interests—and when that failed, terminating her without cause so her unvested membership units would not vest in accordance with Section 14.18 of the 2019 Operating Agreement.

i.   HERNANDEZ surreptitiously altered DIFFENDERFER's vesting schedule and anti-dilution protection in the 2019 Operating Agreement, making DIFFENDERFER's entire ownership interest subject to dilution. In the 2019 Operating Agreement, DIFFENDERFER's anti-dilution protection that existed in Section 13.18 of the 2017 Operating Agreement was removed and the language used in Section 14.18 of the 2019 Operating Agreement to describe DIFFENDERFER's ownership interest changed from a percentage interest to a set number of units, thereby subjecting DIFFENDERFER to dilution.   In conjunction with Sections 4.1 and 4.3 of the 2019 Operating Agreement that give HERNANDEZ as the sole member on the Board of Managers authority to issue additional membership units and protects against dilution for a different class of

units, these changes had a unique detrimental impact on DIFFENDERFER and to benefit HERNANDEZ without a legitimate business purpose.

j.  HERNANDEZ misrepresented to DIFFENDERFER, and otherwise failed to disclose when there was a duty to do so, that he was not properly supervising the use of DIFFENDERFER's American Express credit card that she entrusted HERNANDEZ with and allowed NGD HOMESHARING to use at HERNANDEZ's personal request, as the monthly balances were not paid on time and as HERNANDEZ permitted or otherwise recklessly disregarded that his Newgard employees used the credit card account for Newgard expenses and not in conformance with the agreement reached between HERNANDEZ and DIFFENDERFER pursuant to which she entrusted him with her personal credit.

k.  Prior to November 2017, HERNANDEZ used his position of control over NGD HOMESHARING to surreptitiously redirect NGD HOMESHARING's business opportunities and uniquely harming DIFFENDERFER by using NGD HOMESHARING as a marketing tool and as a means to steer real estate development business to himself through Newgard, Brookfield, other HERNANDEZ affiliated companies and other investors in NGD HOMESHARING instead of placing the real property deals in NGD HOMESHARING or its subsidiaries in accordance with HERNANDEZ's prior representations and the parties' agreement; all while NGD HOMESHARING incurred the costs associated with obtaining, converting, and marketing the deals, and thereafter managing and renting the properties.

l.  HERNANDEZ has intentionally misrepresented to news media and DIFFENDERFER's peers in her industry that HERNANDEZ is the sole founder of Niido and Natiivo and has excluded references and denied credit to DIFFENDERFER who not only is a Co-founder of the parties' Venture that became known as NGD HOMESHARING and later began operating under the tradenames Niido and Natiivo, but she also served as Chief Marketing Officer and spent years as the driving force behind taking the company from a concept to a viable and valuable enterprise. HERNANDEZ's intentional exclusion of DIFFENDERFER in media statements, press releases and similar materials and disclosures in which he refers to himself or allows others to refer to him as the company's founder usurps credit due to DIFFENDERFER and harms her professional reputation and diminishes her career prospects, investment opportunities and marketability to other entrepreneurial ventures going forward.

245.  As a direct and proximate result of HERNANDEZ breaching his duties, DIFFENDERFER has suffered damages, including without limitation: (a) the loss of her promised proportionate ownership interest in NGD HOMESHARING based on an equitable determination

of 1) the amount of sweat equity and the monetary value of the deferred compensation that DIFFENDERFER contributed to the Venture that became known as NGD HOMESHARING between August 2015 to November 29, 2017, versus 2) the amount of the sweat equity and monetary contribution HERNANDEZ actually made to the Venture that became known as NGD HOMESHARING during that same period; (b) the tax consequence DIFFENDERFER suffered as a result of not being able to share in NGD HOMESHARING's losses in 2017; (c) the ability to invest in and profit from related real estate investment opportunities that were made available to other vested members of NGD HOMESHARING in proportion to their vested percentage interests; (d) the proportionate share of Salk's equity interest that DIFFENDERFER should have received after NGD HOMESHARING paid Salk to forego her interest; (e) the ability to find gainful employment in her chosen industry due to arbitrary and oppressive threats to enforce Restrictive Covenants against DIFFENDERFER that have been expressly waived and/or impliedly released against numerous similarly situated investors and executives, including HERNANDEZ himself; (f) the ability to invest and profit from the "Friends and Family" pre-market rate for Natiivo Austin and Natiivo Miami; (g) the amount of accrued "deferred compensation" that DIFFENDERFER was repeatedly promised since December 2015 that HERNANDEZ caused NGD HOMESHARING not to pay to DIFFENDERFER; (h) the value of the unvested membership units that will no longer vest as DIFFENDERFER's "employment" has been terminated; (i) the lost value of DIFFENDERFER's ownership interest in NGD HOMESHARING after losing anti-dilution protection; (j) damage to DIFFENDERFER's personal credit and credit history as she ran large credit card balances that remained unpaid due to HERNANDEZ failing to ensure proper use and payment of the card; and (k) damage to DIFFENDERFER's professional reputation and marketability to future employers and investors.

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

246.    In connection with the aforementioned breaches by HERNANDEZ, and DIFFENDERFER's proximate losses, HERNANDEZ acted recklessly and with such malice, conscious disregard and callous indifference to DIFFENDERFER's rights, and with actual knowledge that his wrongful conduct would likely result in injury to DIFFENDERFER, that punitive damages are warranted.

WHEREFORE, DIFFENDERFER demands entry of a judgment in her favor against HERNANDEZ for damages, pre-judgment interest, and punitive damages in connection with the Defendant's tortious conduct, and any and all other relief that the Court deems just and proper.

**COUNT IV:**
**FRAUDULENT INDUCEMENT – UNPAID WAGES AND ACCRUALS FROM DECEMBER 2015 THROUGH FEBRUARY 2019**
-Against HARVEY HERNANDEZ and NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

247.    In December 2015 and numerous times thereafter, HERNANDEZ both personally and through his and NGD HOMESHRING's representatives and agents, including NGD HOMESHARING's CFO Seth Zimmerman and general counsel Stamm, represented to DIFFENDERFER orally and in writing that starting in December 2015 she was being compensated at the rate of $250,000 annually, which amount was being accrued as "deferred compensation" that would be paid upon a fundraising benchmark being met.

248.    Similarly, in December 2017, and numerous times thereafter, HERNANDEZ both personally and through his and NGD HOMESHRING's representatives and agents, including NGD HOMESHARING's CFO Seth Zimmerman and general counsel Stamm, represented to DIFFENDERFER orally and in writing that starting in December 2017 she was being compensated at the rate of $250,000 annually, but that she would receive $10,000 each month in cash as 1099

income and would continue to accrue the unpaid portion of her $250,000 annual salary (i.e. $10,833/month in addition to the $500,000 already then owed to her) as "deferred compensation" that would be paid upon a fundraising benchmark being met.

249.    When the foregoing representations were made regarding the prospective payment of DIFFENDERFER's accrued "deferred compensation", HERNANDEZ knew or should have known that they were untrue as he did not intend to actually pay DIFFENDERFER for the agreed upon fair value of her services. Alternatively, HERNANDEZ made the foregoing misrepresentations negligently or without knowledge of whether he, the pre-entity formation Venture or NGD HOMESHARING would ever adhere to the representations made to DIFFENDERFER regarding payment of her "deferred compensation" for her services.

250.    HERNANDEZ made the foregoing misrepresentations, and otherwise caused them to be made to DIFFENDERFER intending that she would rely upon them and thereby continue to dedicate her full-time, skills, labor, creative talents, reputation, contacts and resources to the Venture and eventually NGD HOMESHARING.

251.    DIFFENDERFER justifiably relied upon these misrepresentations to her detriment in deciding to dedicate years of her life to working without compensation and thereafter taking further actions in reliance on the misrepresentations, including without limitation executing additional documents including the 2017 Operating Agreement, the Backdated Agreement, the IP Assignment Agreement and other documents that HERNANDEZ requested and otherwise demanded DIFFENDERFER sign in exchange for receiving her long-promised but illusory accrued "deferred compensation" and executive employment agreement.

252.    As a direct and proximate result of HERNANDEZ's misrepresentations, DIFFENDERFER has sustained damages including without limitation: (a) the opportunity costs

of years' of her life's labor without receiving remuneration; (b) the aggregate value of the unpaid accrued "deferred compensation" that she has never received; (c) by virtue of her being induced to execute the 2017 Operating Agreement, being deprived of her proportionate equitable ownership percentage interest in NGD HOMESHARING as promised and agreed between DIFFENDERFER and HERNANDEZ in 2015, 2016 and 2017; (d) by virtue of her being induced to execute the 2017 Operating Agreement, the corresponding loss of her voting and management rights resulting from her decreased ownership percentage interest in the NGD HOMESHARING; (e) by virtue of her losing her voting and management rights, her inability to prevent NGD HOMESHARING from entering the 2019 Operating Agreement, removing her anti-dilution protection and further decreasing the value of her ownership interest; (f) by virtue of her being induced to execute the 2017 Operating Agreement, her purported obligation to adhere to the Restrictive Covenants therein and correspondingly the Restrictive Covenants in the 2019 Operating Agreement; (g) by virtue of her being induced to sign the Backdated Agreement, her purported obligation to adhere to the restrictive covenants and other obligations set forth therein; and (h) by virtue of her being induced to sign the IP Assignment Agreement, her purported assignment of intellectual property rights that are rightfully hers.

253.    In connection with the aforementioned tortious conduct by HERNANDEZ, and DIFFENDERFER's proximate losses, HERNANDEZ acted recklessly and with such malice, conscious disregard and callous indifference to DIFFENDERFER's rights, and with actual knowledge that his wrongful conduct would likely result in injury to DIFFENDERFER, that punitive damages are warranted. So, too, NGD HOMESHARING, though HERNANDEZ as its sole manager, knowingly condoned, ratified and consented to the egregious misconduct, and is liable for punitive damages.

WHEREFORE, DIFFENDERFER demands judgment against HERNANDEZ and NGD HOMESHARING for damages, together with prejudgment interest, taxable costs, reasonable attorney's fees, and punitive damages in connection with the Defendants' tortious conduct, and such other and further relief the Court deems just and proper.

**COUNT V:**
**FRAUDULENT INDUCEMENT – FALSIFIED CAPITAL CONTRIBUTION IN 2017 OPERATING AGREEMENT**
-Against HARVEY HERNANDEZ-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

254.    On numerous occasions prior to November 29, 2017, HERNANDEZ told DIFFENDERFER that he personally invested $1.5 million "in cash" into the Venture and NGD HOMESHARING.

255.    Similarly, in the 2017 Operating Agreement, HERNANDEZ represented that his capital contribution to NGD HOMESHARING was $1.5 million. This capital contribution is reflected and was always disclosed as an investment and not as a loan.

256.    When the foregoing pre-contractual representations were made, HERNANDEZ knew or should have known that they were untrue as he had not invested $1.5 million of cash into the Venture and NGD HOMESHARING. The actual cash he invested into the Venture and NGD HOMESHARING was less 1/10th that amount.  Alternatively, HERNANDEZ made the foregoing misrepresentations negligently or without knowledge of their truth or falsity.

257.    HERNANDEZ made the foregoing misrepresentations to DIFFENDERFER intending that DIFFENDERFER would rely upon them in order to justify to herself why she was foregoing a larger proportionate equitable ownership percentage interest and corresponding voting and management rights in NGD HOMESHARING in light of the tremendous personal and

professional efforts she expended in creating, developing, refining and administering the Venture and ultimately the company.

258.    DIFFENDERFER justifiably relied upon these misrepresentations to her unique detriment in deciding to enter into the 2017 Operating Agreement and taking further actions thereon.

259.    As a direct and proximate result, DIFFENDERFER has sustained damages including without limitation: (a) by virtue of her being induced to execute the 2017 Operating Agreement, the decreased value of her right to receive a proportionate equitable ownership percentage interest in NGD HOMESHARING as promised and agreed between DIFFENDERFER and HERNANDEZ in 2015, 2016 and 2017; (b) by virtue of her being induced to execute the 2017 Operating Agreement, the corresponding loss of her voting and management rights resulting from her decreased ownership percentage interest in the NGD HOMESHARING; (c) by virtue of her losing her voting and management rights, her inability to prevent NGD HOMESHARING from entering the 2019 Operating Agreement, removing her anti-dilution protection; and (d) by virtue of her being induced to execute the 2017 Operating Agreement, her purported obligation to adhere to the Restrictive Covenants therein and correspondingly the Restrictive Covenants in the 2019 Operating Agreement.

260.    In connection with the aforementioned tortious conduct by HERNANDEZ, and DIFFENDERFER's proximate losses, HERNANDEZ acted recklessly and with such malice, conscious disregard and callous indifference to DIFFENDERFER's rights, and with actual knowledge that his wrongful conduct would likely result in injury to DIFFENDERFER, that punitive damages are warranted.

WHEREFORE, DIFFENDERFER demands judgment against HERNANDEZ for damages, together with prejudgment interest, taxable costs, reasonable attorney's fees, and punitive damages in connection with the Defendant's tortious conduct, and such other and further relief the Court deems just and proper.

## COUNT VI:
## RETALIATORY DISCHARGE – PRIVATE WHISTEBLOWER ACT
### -Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

261. This is an action for damages for retaliatory termination against Defendant NGD HOMESHARING pursuant to Florida Statutes § 448.102.

262. At all material times, DIFFENDERFER was a misclassified employee of NGD HOMESHARING as defined in Florida Statutes §448.101(2), as she performed services for NGD HOMESHARING and was under its control and direction for wages and other renumeration.

263. At all material times, NGD HOMESHARING was an employer as defined in Florida Statutes §448.101(3) as it is a private company that employs ten or more persons.

264. On numerous occasions, as set forth in detail hereinabove, DIFFENDERFER objected to NGD HOMESHARING's inaction, tantamount to neglecting statutory and common law duties, in enforcing Restrictive Covenants that appear in the 2017 and 2019 Operating Agreements, and non-disclosures and false disclosures of material information and financial information to investors and in connection with its investment raising activities as directed by its Manager HERNANDEZ. These included, without limitation, concealing the source of funds for HERNANDEZ's purported capital contributions in the 2017 and 2019 Operating Agreements when DIFFENDERFER asked for same; presenting the Backdated Agreement as if it were

genuine, authentic and executed on the date stated therein; concealing and failing to disclose facts regarding Salk and the Salk settlement; and concealing and failing to disclose the COO's direct conflict of interest to investors.

265.   The inaction, non-disclosures and false disclosures that DIFFENDERFER objected to were in violation of NGD HOMESHARING's governing documents, federal laws, state statutory and common law, and regulations governing transactions such as the private offering to investors that closed in early 2019.

266.   As a direct result of DIFFENDERFER's objections, NGD HOMESHARING, through its agents and representatives, engaged in unlawful retaliatory conduct, including without limitation:

1.   attempting to extract monies from DIFFENDERFER as a condition of maintaining her employment and wages;

2.   removing anti-dilution protection from DIFFENDERFER's vesting schedule;

3.   refusing to execute the negotiated, drafted and promised written employment agreement to DIFFENDERFER;

4.   refusing to pay DIFFENDERFER compensation owed to her; and discharged DIFFENDERFER from her employment after her continued objections revealed she intended to countermand her employer and ensure disclosure of such information to investors;

5.   demoting and marginalizing DIFFENDERFER and her position; and

6.   limiting DIFFENDERFER's access to information and financial records of the business she originated, co-founded and was charged with managing.

267.   NGD HOMESHARING's treatment of DIFFENDERFER constituted a retaliatory personnel action in violation of Florida Statutes § 448.102(3) that prohibits an employer from taking retaliatory action against an employee because that employee has: "Objected to, or refused to participate in an activity, policy, or practice of the employer which is in violation of law, rule,

or regulation."

268.    NGD HOMESHARING's unlawful retaliation against DIFFENDERFER was willful, malicious and taken with reckless indifference to DIFFENDERFER's rights.

269.    As a result of NGD HOMESHARING's unlawful, retaliatory conduct, DIFFENDERFER has suffered damages, including but not limited to economic and non-economic damages.

WHEREFORE, DIFFENDERFER demands judgment against NGD HOMESHARING for economic damages, including lost wages, benefits, and other remuneration; front pay and back pay; and other compensatory damages allowable under law; reinstatement of employment; an injunction against the violative conduct; emotional distress damages, prejudgment interest and post-judgment interest; statutory attorneys' fees and costs, and any other and further relief as the Court deems just and proper.

## COUNT VII:
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
-Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

270.    This is an action for civil damages against Defendant NGD HOMESHARING for violations of 18 U.S.C. § 1030, the "Computer Fraud and Abuse Act."

271.    At all material times, DIFFENDERFER's company-issued computer was a protected computer as defined in 18 U.S.C. § 1030(e)(2), and DIFFENDERFER was the owner of certain protected information stored and maintained therein, including on cloud/web-based storage systems, including without limitation Dropbox and icloud that contained here password protected information and materials.

272.     As the owner of information stored in a protected computer used in the operation of a business DIFFENDERFER is entitled to the protections and remedies under the Computer Fraud and Abuse Act.

273.     Defendant NGD HOMESHARING itself through others under its direct control, and without authorization or permission and otherwise exceeded authorized access from DIFFENDERFER, improperly accessed DIFFENDERFER's private and personal information stored on the computer and information accessed via the computer using DIFFENDERFER's passwords and cloud/web-based storage systems that belonged exclusively to and was owned by DIFFENDERFER.

274.     In so doing, NGD HOMESHARING caused harm to the misappropriated information and improperly impaired the integrity, access or availability of data, programs, systems or information to DIFFENDERFER.

275.     As a direct and proximate result of NGD HOMESHARING's unlawful misappropriation, DIFFENDERFER has suffered losses as defined by 18 U.S.C. § 1030(c)(4)(A)(i)(I), and §1030(g) in excess of $5,000, including but not limited to costs incurred in connection with assessing the damages caused by the violations and remediation efforts including legal fees, economic damages, and other consequential damages.

WHEREFORE, DIFFENDERFER requests judgment against Defendant NGD HOMESHARING for damages and prejudgment interest, as well as recovery from Defendant of the misappropriated information and all copies thereof, and such other and further relief as this Court deems just and equitable.

**COUNT VIII:**
**VIOLATION OF FLORIDA COMPUTER ABUSE AND DATA RECOVERY ACT**
-Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

276.    This is an action for civil damages against Defendant, NGD HOMESHARING for violations of Florida Statutes § 668.801 *et seq.,* Florida's "Computer Abuse and Data Recovery Act."

277.    At all material times, DIFFENDERFER's company-issued computer was a protected computer as defined in Florida Statutes §668.802(6), and DIFFENDERFER was the owner of certain protected information stored and maintained therein, including on cloud/web-based storage systems, including without limitation Dropbox and icloud that contained her password protected information and materials.

278.    As the owner of information stored in a protected computer used in the operation of a business DIFFENDERFER is entitled to the protections and remedies under the Florida Computer Abuse and Recovery Act.

279.    Defendant, NGD HOMESHARING itself through others under its direct control, and without authorization or permission and otherwise exceeded authorized access, from DIFFENDERFER, improperly accessed DIFFENDERFER's private and personal information stored on the computer and information accessed via the computer using DIFFENDERFER's passwords and cloud/web-based storage systems that belonged exclusively to and was owned by DIFFENDERFER.

280.    In so doing, NGD HOMESHARING caused harm to the misappropriated information and improperly impaired the integrity, access or availability of data, programs,

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

systems or information.

281.    As a direct and proximate result of NGD HOMESHARING's unlawful misappropriation, DIFFENDERFER has suffered losses in excess of $5,000, including but not limited to costs incurred in connection with assessing the damages caused by the violations and remediation efforts, economic damages, and other consequential damages.

282.    Pursuant to Florida Statutes § 668.804(2), DIFFENDERFER is entitled to recover her reasonable attorney's fees upon prevailing herein.

WHEREFORE,   DIFFENDERFER   requests   judgment   against   Defendant   NGD HOMESHARING for damages and prejudgment interest, as well as recovery from Defendant of the misappropriated information and all copies thereof, together with costs of suit and reasonable attorney fees, and such other and further relief as this Court deems just and equitable.

## COUNT IX:
## CONVERSION
### -Against NGD HOMESHARING-

 Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

283.    At all material times, DIFFENDERFER was the owner of certain property consisting of protected data, files, and information stored in her company-issued computer, and data, files and information stored outside of the computer on web-based servers but accessed via certain protected information, including passwords, located in the computer.

284.    Defendant NGD HOMESHARING itself through others under its direct control, and without authorization or permission, accessed DIFFENDERFER's data, files and information and misappropriated her property for its own use, and causing some of the property to be impaired, damaged or destroyed.

285.   DIFFENDEFER has made demand upon NGD HOMESHARING for the return of the misappropriated property to no avail.

286.   As a direct and proximate result of NGD HOMESHARING's unlawful misappropriation, DIFFENDERFER has been damaged.

WHEREFORE, DIFFENDERFER requests judgment against NGD HOMESHARING for damages and prejudgment interest, costs of suit, and such other and further relief as this Court deems just and equitable.

### COUNT X:
### BREACH OF CONTRACT FOR EXTENSION OF CREDIT
-Against NGD HOMESHARING–

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 about as though fully set forth herein.

287.   This is an action for damages against Defendant NGD HOMESHARING for breach of contract.

288.   In July 2018, DIFFENDERFER entered into an oral agreement with NGD HOMESHARING in which she agreed to lend the company her personal credit with American Express to open a charge account to be used solely by NGD HOMESHARING, and its employees.

289.   The accord was expressly conditioned on NGD HOMESHARING's agreement to pay all statement balances in full each month, on a timely basis, so that DIFFENDERFER's credit would not be adversely affected.

290.   DIFFENDERFER performed the agreement in full, and American Express extended a credit account for use by the company and its employees that was guaranteed by DIFFENDERFER as an extension of DIIFENDERFER's credit to NGD HOMESHARING.

291.   NGD HOMESHARING breached the agreement by failing to pay all statement

balances in full each month, or in a timely manner.

292.   NGD HOMESHARING further breached the agreement by permitting employees of Newgard to utilize the charge account for Newgard expenses, without authorization of DIFFENDERFER.

293.   As a result of NGD HOMESHARING's breach of the agreement, DIFFENDERFER has been damaged, and her credit has been adversely affected.

WHEREFORE, DIFFENDERFER requests judgment against Defendant NGD HOMESHARING for damages, including special damages for damage to her credit score, and prejudgment interest, costs of suit, and such other and further relief as this Court deems just and equitable.

<u>**COUNT XI:**</u>
**REFORMATION OF THE 2017 AND 2019 OPERATING AGREEMENTS**
-Against HERNANDEZ and NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

294.   After becoming business partners in the third quarter of 2015, DIFFENDERFER and HERNANDEZ agreed they would each receive a proportionate equitable ownership percentage interest in the Venture that became known as NGD HOMESHARING, based on their respective contributions of time, effort and money.

295.   DIFFENDERFER contributed her full-time, personal and professional efforts and deferred all her compensation for a period of more than two years after dedicating herself to the Venture that became known as NGD HOMESHARING.

296.     HERNANDEZ remained involved on a part-time basis and assumed a management role but not a day-to-day operational or key-person role in the development and execution of the Venture and its business plan.

297.     On numerous occasions prior to November 29, 2017, HERNANDEZ told DIFFENDERFER that he personally invested $1.5 million "in cash" into the Venture and NGD HOMESHARING.

298.     Similarly, in the 2017 Operating Agreement, HERNANDEZ represented that his capital contribution to NGD HOMESHARING was $1.5 million. This capital contribution is reflected and was always disclosed as an investment and not as a loan.

299.     When these representations were made, HERNANDEZ knew they were untrue as he had not invested $1.5 million of cash into the Venture and NGD HOMESHARING. The actual cash he invested into the Venture and NGD HOMESHARING was less than 1/10th that amount.

300.     In the years and months leading up to the 2017 Operating Agreement, and based upon her discussions with HERNANDEZ, DIFFENDERFER proceeded on the basis that her membership interest in NGD HOMESHARING would be proportionate and equitable, and commensurate with her significant and tireless efforts on behalf of HERNANDEZ and NGD HOMESHARING, and the hugely successful results of her labor.

301.     Unbeknownst to DIFFENDERFER, in connection with the initial round of capitalization, HERNANDEZ negotiated and finalized the 2017 Operating Agreement without her material knowledge or participation.   That Agreement contained a hugely disproportionate ownership percentage interest as between DIFFENDERFER and HERNANDEZ.

302.     Until DIFFENDERFER was first presented with the 2017 Operating Agreement on the morning of November 29, 2017, when HERNANDEZ used coercion, deceit and intimidation

to extract her signature, DIFFENDERFER relied upon her many discussions with HERNANDEZ, where he had reassured her that their respective membership interests in NGD HOMESHARING would be fair and proportionate and reflective of their respective efforts and contributions to the Venture.

303.     Although it was not immediately apparent to DIFFENDERFER, HERNANDEZ intended that DIFFENDERFER would also rely upon his misrepresentations about his $1.5 million "cash" investment.

304.     On November 29, 2017, HERNANDEZ continued to make misrepresentations of material fact to DIFFENDERFER, and using these misrepresentations, intentionally deceived, intimidated, coerced and induced DIFFENDERFER into foregoing a larger share of her ownership interest in his favor, and therefore allowing HERNANDEZ a disproportionately larger ownership percentage interest and corresponding voting and management rights in NGD HOMESHARING.

305.     Through HERNANDEZ's fraud and misconduct, duress and coercion, DIFFENDERFER was duped, induced and intimidated into executing the 2017 Operating Agreement that provided her a smaller disproportionate and inequitable interest, that did not reflect the parties' prior agreement or the tremendous personal and professional efforts she expended in creating, developing, refining and administering the Venture and ultimately NGD HOMESHARING.

306.     Rather than risk injury to NGD HOMESHARING, and being threatened with the loss of her position, accrued "deferred compensation" and promised employment agreement, and fearing having her exhaustive efforts over the prior two years go to waste, and further based upon HERNANDEZ's false representations and active fraud regarding his sizeable personal investment, DIFFENDERFER reluctantly executed the 2017 Operating Agreement under protest.   As a result,

the 2017 Operating Agreement resulted from DIFFENDERFER's justifiable mistake and HERNANDEZ's fraud and other misconduct by HERNANDEZ.

307.    HERNANDEZ's equity interest as reflected in the 2019 Operating Agreement is also disproportionate and follows the same disproportionate equity distribution as reflected in the 2017 Operating Agreement. It is significantly based upon a non-existent $1.5 million "cash" capital contribution that HERNANDEZ falsified.  Although DIFFENDERFER did not execute the 2019 Operating Agreement, it purports to bind her as an owner and member, and adheres to the same disproportionate membership interests as between herself and HERNANDEZ.

308.    Due to her mistake brought on by HERNANDEZ's fraud and misconduct, DIFFENDERFER is entitled to reformation of the 2017 Operating Agreement and the ensuing 2019 Operating Agreement, and specifically the capitalization table and ownership structure that assigns the disproportionate distribution as between HERNANDEZ and DIFFENDEFER.

309.    The ownership distribution as between HERNANDEZ and DIFFENDERFER is completely divisible from, and independent of the rights of other members and investors and other parties to the Operating Agreements, who are not affected by the relief sought herein.

310.    DIFFENDERFER has no adequate remedy at law.

WHEREFORE, DIFFENDERFER requests entry of a judgment of reformation of the 2017 and 2019 Operating Agreements, and requests this Court exercise its equitable powers to reform the portions of the 2017 and 2019 Operating Agreements that set forth the disproportionate ownership distribution to reflect the proportionate and equitable division of ownership as between herself and HERNANDEZ as per their pre-contractual discussions and intent as well as their actual contributions of time, effort and money to NGD HOMESHARING during the relevant period, and that eliminates the inequitable and disproportionate ownership percentages that resulted entirely

from HERNANDEZ's fraud and misconduct, together with costs of suit and such other and further relief as this Court deems just and proper.

## COUNT XII:
## PARTIAL RESCISSION OF 2017 AND 2019 OPERATING AGREEMENTS DUE TO FRAUD AND OTHER MISCONDUCT
-Against HERNANDEZ & NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

311.    After becoming business partners in the third quarter of 2015, DIFFENDERFER and HERNANDEZ agreed they would each receive a proportionate equitable ownership percentage interest in the Venture that became known as NGD HOMESHARING, based on their respective contributions of time, effort and money.

312.    DIFFENDERFER contributed her full-time, personal and professional efforts and deferred all her compensation for a period of more than two years after dedicating herself to the Venture that became known as NGD HOMESHARING.

313.    HERNANDEZ remained involved on a part-time basis and assumed a management role but not a day-to-day operational or key-person role in the development and execution of the Venture and its business plan.

314.    On numerous occasions prior to November 29, 2017, HERNANDEZ told DIFFENDERFER that he personally invested $1.5 million "in cash" into the Venture and NGD HOMESHARING.

315.    Similarly, in the 2017 Operating Agreement, HERNANDEZ represented that his capital contribution to NGD HOMESHARING was $1.5 million. This capital contribution is reflected and was always disclosed as an investment and not as a loan.

316.    When the foregoing pre-contractual representations were made, HERNANDEZ knew or should have known that they were untrue as he had not invested $1.5 million of cash into the Venture and NGD HOMESHARING. The actual cash he invested into the Venture and NGD HOMESHARING was less than 1/10th that amount.  Alternatively, HERNANDEZ made the foregoing misrepresentations negligently or without knowledge of their truth or falsity.

317.    HERNANDEZ made the foregoing misrepresentations to DIFFENDERFER intending that DIFFENDERFER would rely upon them in order to justify to herself why she was foregoing a larger proportionate equitable ownership percentage interest and corresponding voting and management rights in NGD HOMESHARING in light of the tremendous personal and professional efforts she expended in creating, developing, refining and administering the Venture and ultimately the company.

318.    DIFFENDERFER justifiably relied upon these misrepresentations to her unique detriment in entering into the 2017 Operating Agreement and taking further actions thereon.

319.    In addition, DIFFENDERFER executed the 2017 Operating Agreement under conditions of extreme duress and coercion, based upon HERNANDEZ's and others' threats and verbal and physical intimidation, and real and significant risk of termination, and loss of income.

320.    Rather than risk injury to NGD HOMESHARING, and given threatened the loss of her position, reputation, and promised employment agreement, and having her exhaustive efforts over the prior two years go to waste,  and based upon HERNANDEZ's false representations regarding his sizeable personal investment, DIFFENDERFER reluctantly executed the 2017 Operating Agreement under protest.

321.    HERNANDEZ's equity interest as reflected in the 2019 Operating Agreement is disproportionate and inequitable and follows the equity interest as reflected in the 2017 Operating

Agreement, and is the product of his numerous false misrepresentations that he contributed $1.5 million in capital.  Although DIFFENDERFER did not execute the 2019 Operating Agreement, it purports to bind her as an owner and member, and with regard to her ownership percentage, as it adheres to the same disproportionate membership interests as between herself and HERNANDEZ that are the product of HERNANDEZ's fraud.

322.    As a direct and proximate result of these misrepresentations, DIFFENDERFER has sustained damages including *inter alia*: (a) by virtue of her being induced to execute the 2017 Operating Agreement, being deprived of her proportionate equitable ownership percentage interest in NGD HOMESHARING as promised and agreed between DIFFENDERFER and HERNANDEZ in 2015, 2016 and 2017; (b) by virtue of her being induced to execute the 2017 Operating Agreement, the corresponding loss of her voting and management rights resulting from her decreased ownership percentage interest in the NGD HOMESHARING; (c) by virtue of her losing her voting and management rights, her inability to prevent NGD HOMESHARING from entering the 2019 Operating Agreement, removing her anti-dilution protection; and (d) by virtue of her being induced to execute the 2017 Operating Agreement, her purported obligation to adhere to the Restrictive Covenants therein and correspondingly the Restrictive Covenants in the 2019 Operating Agreement.

323.    DIFFENDERFER never agreed to the 2019 Operating Agreement and, further, rescinds the 2017 Operating Agreement as between herself, NGD HOMESHARIING and HERNANEZ, with regard to DIFFENDERFER's and HERNANDEZ's disproportionate membership interests, which are based entirely upon HERNANDEZ's duress, deceit, and fraudulent misrepresentations of a non-existent $1.5 million cash investment.

324.   Due to the fraud and misconduct worked upon DIFFENDERFER by HERNANDEZ, partial rescission of the 2017 and 2019 Operating Agreements is appropriate, in particular, with respect to the capitalization tables contained therein as affecting HERNANDEZ's and DIFFENDERFER's respective membership interests.   The ownership distribution as between HERNANDEZ and DIFFENDERFER is completely divisible from, and independent of the rights of other members and investors, and other parties to the 2017 and 2019 Operating Agreements who are not affected by the relief sought herein.

325.   HERNANDEZ and NGD HOMESHARING are on notice that DIFFENDERFER never agreed to the 2019 Operating Agreement and that she has rescinded the 2017 Operating Agreement as provided herein.

326.   DIFFENDERFER has no adequate remedy at law.

WHEREFORE, DIFFENDERFER requests entry of a judgment of partial rescission of the 2017 and 2019 Operating Agreements, in particular with respect to the capitalization tables contained therein as affecting HERNANDEZ's and DIFFENDERFER's respective membership interests, costs of suit and such other and further relief as this Court deems just and proper.

<u>**COUNT XIII:**</u>
**RESCISSION OF IP ASSIGNMENT AGREEMENT DUE TO FRAUD AND OTHER MISCONDUCT**
-Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

327.   This is an action against Defendant, NGD HOMESHARING for rescission of a contract procured by fraud and other improper means.

328.   On January 21, 2019, DIFFENDERFER executed the IP Assignment Agreement in which she assigned intellectual property rights to NGD HOMESHARING.

329.    HERNANDEZ, on behalf of NGD HOMESHARING and as its authorized representative, knowingly and intentionally induced DIFFENDERFER into signing the Agreement through false representations and promises, specifically including without limitation his representations regarding payment of DIFFENDERFER's accrued but unpaid "deferred compensation".

330.    Additionally, in order to induce DIFFENDERFER into executing the IP Assignment Agreement, HERNANDEZ verbally represented and promised he would be extending to DIFFENDERFER a formal written employment agreement upon her signing the IP Assignment Agreement.

331.    At the time of making the representations to DIFFENDERFER, HERNANDEZ knew these were false as HERNANDEZ had no intention to perform as promised, and intended to induce DIFFENDERFER into executing the IP Assignment Agreement so that she would relinquish her intellectual property rights and provide them to NGD HOMESHARING.  Indeed, HERNANDEZ refused to sign a written employment agreement, he demoted DIFFENDERFER 10-days later and discharged DIFFENDERFER less than one month later.

332.    DIFFENDERFER executed the IP Assignment Agreement in reliance on HERNANDEZ's false promises and misrepresentations and would not have executed the IP Assignment Agreement but for the false promises regarding extending DIFFENDERFER a written employment agreement.

333.    As a direct and proximate result of being induced to execute the IP Assignment Agreement, DIFFENDERFER has been damaged.

334.    Due to HERNANDEZ's fraud and misconduct worked upon DIFFENDERFER, rescission of the IP Assignment Agreement is appropriate.

Davis Goldman, PLLC · Miami │ Hollywood · Tel 305·800·6673 · Fax 305·675·7880

335.     NGD HOMESHARING is on notice that DIFFENDERFER has rescinded the IP Assignment Agreement.

336.     DIFFENDERFER has no adequate remedy at all.

WHEREFORE, Plaintiff, CINDY DIFFENDERFER requests entry of a judgment of rescission of the IP Assignment Agreement dated January 21, 2019, costs of suit and such other and further relief as this Court deems just and proper.

## COUNT XIV:
## RESCISSION OF BACKDATED AGREEMENT DUE TO FRAUD AND RELATED MISCONDUCT
### -Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

337.     This is an action against Defendant, NGD HOMESHARING for rescission of a contract procured by fraud and other improper means.

338.     In December 2018, DIFFENDERFER executed the Backdated Agreement as she was induced on false and inappropriate grounds to agree to restrictions on her ability to possess, use and disclose her own information, relationships, contacts, and intellectual property, and additionally agreed not to compete with, solicit from or disparage Defendant NGD HOMESHARING or its "Affiliates" and principals, including without limitation HERNANDEZ.

339.     HERNANDEZ, on behalf of NGD HOMESHARING and as its authorized representative, knowingly and intentionally induced DIFFENDERFER into signing and backdating the Backdated Agreement through false representations and promises, specifically including without limitation his representations regarding payment of DIFFENDERFER's accrued but unpaid "deferred compensation".

340.     Additionally, in order to induce DIFFENDERFER into executing the Backdated

Agreement, HERNANDEZ verbally represented and promised he would be extending to DIFFENDERFER a formal written employment agreement upon her signing the Backdated Agreement.

341.    At the time of making the representations to DIFFENDERFER, HERNANDEZ knew these were false as HERNANDEZ had no intention to perform as promised, and intended to induce DIFFENDERFER into executing the Backdated Agreement so that she would relinquish her rights and provide them to NGD HOMESHARING.  Indeed, HERNANDEZ refused to sign a written employment agreement, he demoted DIFFENDERFER shortly thereafter and discharged DIFFENDERFER before ever paying her any of the long-promised "deferred compensation".

342.    DIFFENDERFER executed the Backdated Agreement in reliance on HERNANDEZ's false promises and misrepresentations and would not have executed the Backdated Agreement but for the false promises regarding extending DIFFENDERFER a written employment agreement.

343.    As a direct and proximate result of being induced to execute the Backdated Agreement, DIFFENDERFER has been damaged.

344.    Due to HERNANDEZ's fraud and misconduct worked upon DIFFENDERFER, rescission of the Backdated Agreement is appropriate.

345.    NGD HOMESHARING is on notice that DIFFENDERFER has rescinded the Backdated Agreement.

346.    DIFFENDERFER has no adequate remedy at all.

WHEREFORE, Plaintiff, CINDY DIFFENDERFER requests entry of a judgment of rescission of the Backdated Agreement, costs of suit and such other and further relief as this Court deems just and proper.

Davis Goldman, PLLC · Miami | Hollywood · Tel 305·800·6673 · Fax 305·675·7880

## COUNT XV:
**DECLARATORY JUDGMENT DECLARING RESTRICTIVE COVENANTS IN THE 2017 OPERATING AGREEMENT UNENFORCEABLE AGAINST DIFFENDERFER AS BEING TOO FAR-REACHING IN BREADTH, DURATION AND LOCATION AND NOT REASONABLY DESIGNED TO PROTECT DEFENDANT NGD HOMESHARING'S LEGITIMATE BUSINESS INTEREST**
-Against NGD HOMESHARING-

347.    Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

348.    This is an action for declaratory relief pursuant to 28 U.S.C. §2201-2202, the Declaratory Judgment Act,  and applicable law, including Fla. Stat. §§ 542.335 and 542.18, regarding the reasonableness and enforceability of the Restrictive Covenants in the 2017 Operating Agreement, particularly in light of the facts and circumstances surrounding DIFFENDERFER's execution of that document.

349.    DIFFENDERFER remains a member of Defendant NGD HOMESHARING and does not intend to renounce her membership interest.

350.    Pursuant to the broad terms of the Restrictive Covenants in the 2017 Operating Agreement, for so long as DIFFENDERFER is a member of Defendant, NGD HOMESHARING, the Restricted Covenants prohibit her from engaging "in any business, activity, enterprise or venture that conducts activities or provides products or services of the type conducted, offered or provided" by Defendant, NGD HOMESHARING.

351.    Following her termination by Defendant, NGD HOMESHARING in February 2019, DIFFENDERFER seeks employment with a real estate development entity with projects throughout the United States, and whose business activities may be, or may become, similar to that of Defendant, NGD HOMESHARING as those ambiguous and broadly defined business activities

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

are not specified in the 2017 Operating Agreement and as they are subject to change from "time to time".

352.   In their current iteration, the Restrictive Covenants prohibit her from engaging in any business in the same "business" as Defendant NGD HOMESHARING in perpetuity for as long as DIFFENDERFER remains a member of Defendant NGD HOMESHARING.

353.   The Restrictive Covenants do not protect a legally protectable interest but are intended solely to prohibit or diminish competition and preclude DIFFENDERFER's employment in the same field or industry as Defendant, NGD HOMESHARING.

354.   On information and belief, in multiple instances, corporate governance documents, restrictive covenant agreements, and oral permission and/or "side letters" excusing compliance with same have been the product of conflict of interest transactions in which various employees, contractors, principals and/or investors of Defendant, NGD HOMESHARING have been excused from compliance with the Restrictive Covenants and no effort to enforce the Restrictive Covenants against them has been attempted.

355.   Conversely, in an unambiguous and express manner, in May 2019, through its representatives, including its Chief Financial Officer and General Counsel, Defendant NGD HOMESHARING expressed to DIFFENDERFER that it fully intended to enforce the Restrictive Covenants against her in perpetuity should she seek employment in Defendant NGD HOMESHARING's business, as the same may be defined and/or change from time to time, for so long as she remains a member of NGD HOMESHARING, indicating that NGD HOMESHARING would litigate against DIFFENDERFER if she sought employment in violation of any of the covenants.

356.    There is a bona fide dispute between the parties as to the reasonableness of the limitations in the Restrictive Covenants and their enforceability as to DIFFENDERFER, especially in light of Defendant NGD HOMESHARING's selective enforcement of the restrictions, express waivers for favored employees, principals and investors, and the lack of protectable business interest.

357.    DIFFENDERFER has a justiciable question as to her rights and obligations under the Restrictive Covenants, and in particular, her rights to seek employment in the same field or industry as Defendant NGD HOMESHARING.

358.    DIFFENDERFER is in doubt regarding her rights and obligations under the Restrictive Covenants, and its enforceability.

359.    There is a bona fide, actual, present need for a judicial declaration regarding (a) the reasonableness of the time and place limitations in the Restrictive Covenants, (b) the enforceability of the Restrictive Covenants against DIFFENDERFER given Defendant NGD HOMESHARING's selective enforcement and absence of a protectable business interest; and (c) the parties respective rights and obligations, if any, under the Restrictive Covenants.

360.    All persons who have an interest in the outcome of this proceeding are parties herein.

WHEREFORE, Plaintiff, CINDY DIFFENDERFER requests this Court (a) declare the parties' respective rights and obligations under the Restrictive Covenants in the 2017 Operating Agreement, and in particular; (b) declare whether the Restrictive Covenants are enforceable, and if not, declare them void as to DIFFENDERFER; (c) if the Restrictive Covenants are enforceable, declare whether the time and place restrictions in the Restrictive Covenants are reasonable, and if not, impose modifications as are appropriate; (d) enjoin enforcement the Restrictive Covenants, or

any portion thereof, in a manner that is inconsistent with the Court's declarations as to validity, reasonableness and scope, and (e) grant such other and further relief as this Court deems appropriate, and award DIFFENDERFER her costs in connection with this proceeding.

### COUNT XVI:
**DECLARATORY JUDGMENT DECLARING RESTRICTIVE COVENANTS IN THE 2019 OPERATING AGREEMENT UNENFORCEABLE AGAINST DIFFENDERFER AS BEING TOO FAR-REACHING IN BREADTH, DURATION AND LOCATION AND NOT REASONABLY DESIGNED TO PROTECT DEFENDANT NGD HOMESHARING'S LEGITIMATE BUSINESS INTEREST**
-Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

361.   This is an action for declaratory relief pursuant to 28 U.S.C. §2201-2202, the Declaratory Judgment Act, and applicable law, including Fla. Stat. §§ 542.335 and 542.18, regarding the reasonableness and enforceability of the Restrictive Covenants in the 2019 Operating Agreement, particularly in light of DIFFENDERFER's refusal to execute that document and HERNANDEZ's removal of any place for her to sign it.

362.   DIFFENDERFER remains a member of Defendant, NGD HOMESHARING and does not intend to renounce her membership interest.

363.   Pursuant to the broad terms of the Restrictive Covenants in the 2019 Operating Agreement, for so long as DIFFENDERFER is a member of Defendant, NGD HOMESHARING, the Restricted Covenants prohibit her from engaging "in any business, activity, enterprise or venture that conducts activities or provides products or services of the type conducted, offered or provided" by Defendant NGD HOMESHARING.

364.   Following her termination by Defendant, NGD HOMESHARING in February 2019, DIFFENDERFER seeks employment with a real estate development entity with projects

throughout the United States, and whose business activities may be, or may become, similar to that of Defendant, NGD HOMESHARING as those ambiguous and broadly defined business activities are not specified in the 2019 Operating Agreement and as they are subject to change from "time to time".

365.    In their current iteration, the Restrictive Covenants prohibit her from engaging in any business in the same "business" as Defendant, NGD HOMESHARING in perpetuity for as long as DIFFENDERFER remains a member of Defendant, NGD HOMESHARING.

366.    The Restrictive Covenants do not protect a legally protectable interest but are intended solely to prohibit or diminish competition and preclude DIFFENDERFER's employment in the same field or industry as Defendant NGD HOMESHARING.

367.    On information and belief, in multiple instances, corporate governance documents, restrictive covenant agreements, and oral permission and/or "side letters" excusing compliance with same have been the product of conflict of interest transactions in which various employees, contractors, principals and/or investors of Defendant NGD HOMESHARING have been excused from compliance with the Restrictive Covenants and no effort to enforce the Restrictive Covenants against them has been attempted.

368.    Conversely, in an unambiguous and express manner, in May 2019, through its representatives, including its Chief Financial Officer and General Counsel, Defendant NGD HOMESHARING expressed to DIFFENDERFER that it fully intended to enforce the Restrictive Covenants against her in perpetuity should she seek employment in Defendant, NGD HOMESHARING's business, as the same may be defined and/or change from time to time, for so long as she remains a member of NGD HOMESHARING, indicating that NGD HOMESHARING

would litigate against DIFFENDERFER if she sought employment in violation of any of the covenants.

369.    There is a bona fide dispute between the parties as to the reasonableness of the limitations in the Restrictive Covenants and their enforceability as to DIFFENDERFER, especially in light of Defendant NGD HOMESHARING's selective enforcement of the restrictions, express waivers for favored employees, principals and investors, and the lack of protectable business interest.

370.    DIFFENDERFER has a justiciable question as to her rights and obligations under the Restrictive Covenants, and in particular, her rights to seek employment in the same field or industry as Defendant, NGD HOMESHARING.

371.    DIFFENDERFER is in doubt regarding her rights and obligations under the Restrictive Covenants, and its enforceability.

372.    There is a bona fide, actual, present need for a judicial declaration regarding (a) the reasonableness of the time and place limitations in the Restrictive Covenants, (b) the enforceability of the Restrictive Covenants against DIFFENDERFER given Defendant NGD HOMESHARING's selective enforcement and absence of a protectable business interest; and (c) the parties respective rights and obligations, if any, under the Restrictive Covenants.

373.    All persons who have an interest in the outcome of this proceeding are parties herein.

WHEREFORE, Plaintiff, CINDY DIFFENDERFER requests this Court (a) declare the parties' respective rights and obligations under the Restrictive Covenants in the 2019 Operating Agreement, and in particular; (b) declare whether the Restrictive Covenants are enforceable, and if not, declare them void as to DIFFENDERFER; (c) if the Restrictive Covenants are enforceable,

declare whether the time and place restrictions in the Restrictive Covenants are reasonable, and if not, impose modifications as are appropriate; (d) enjoin enforcement the Restrictive Covenants, or any portion thereof, in a manner that is inconsistent with the Court's declarations as to validity, reasonableness and scope; and (e) grant such other and further relief as this Court deems appropriate, and award DIFFENDERFER her costs in connection with this proceeding.

**COUNT XVII:**
**DECLARATORY JUDGMENT DECLARING RESTRICTIVE COVENANTS IN THE BACKDATED AGREEMENT UNENFORCEABLE AGAINST DIFFENDERFER AS BEING TOO FAR-REACHING IN BREADTH, DURATION AND LOCATION AND NOT REASONABLY DESIGNED TO PROTECT DEFENDANT NGD HOMESHARING'S LEGITIMATE BUSINESS INTEREST**
-Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

374.    This is an action for declaratory relief, brought in the alternative should the Backdated Agreement not be rescinded, pursuant to 28 U.S.C. §2201-2202, the Declaratory Judgment Act, and applicable law, including Fla. Stat. §§ 542.335 and 542.18, regarding the reasonableness and enforceability of the restrictive covenants in the Backdated Agreement, particularly in light of the facts and circumstances surrounding DIFFENDERFER's execution of that document.

375.    DIFFENDERFER is a former misclassified employee of Defendant NGD HOMESHARING, having been terminated from her employment on February 19, 2019.

376.    Pursuant to the broad terms of the restrictive covenants in the Backdated Agreement, even following termination of her employment with Defendant NGD HOMESHARING the restrictive covenants continue to prohibit her from certain activities, as follows:

88

3. <u>Non-Disclosure of Confidential Information</u>. Consultant will not, while employed and retained by Company and at **any time after the date of termination of employment** and retention with Company, **communicate, divulge or transmit <u>any</u> Confidential Information or other proprietary information, <u>knowledge</u>, or <u>data</u> of or <u>relating to Company, or any part thereof</u>, directly or <u>indirectly</u>, to any other person or business or to any non-Company email, except as may be necessary in the normal course of performing his/her duties for Company or with the written permission of Company**. Consultant further agrees not to improperly use or disclose any confidential information or trade secrets, if any, of any former Company or any other person or entity to whom Consultant has an obligation of confidentiality.

4. <u>Intellectual Property Rights</u>. All inventions, works, content, source code, modifications, alterations, enhancements, improvements, ideas, or discoveries created in whole or in part by Consultant within the scope of or in connection with his/her employment and retention or affiliation with the Company or Consultant's access to Confidential Information (collectively "Works") shall be the sole and exclusive property of the Company and are considered a "work made for hire" for the purposes of the Company's rights under copyright and other laws. To the extent that any Work does not constitute or may not be considered a "work made for hire," Consultant hereby assigns to the Company all right, title, and interest in and to such Work. Consultant shall take all necessary steps, whether during or **at any time after employment and retention**: (a) to execute all documents as required by the Company, in its sole discretion, to evidence assignment of any Work, and (b) to assist the Company in registering, prosecuting, perfecting, protecting, maintaining and enforcing any and all patent, copyright, trademark, trade secret, or other right or interest in any Work for any and all countries. If any Work is based upon, or is incorporated into or is an improvement or derivative of, or cannot reasonably be made, used, reproduced and/or distributed without using or violating technology or rights owned or licensed by the Company and not acquired or assigned hereunder, Consultant shall grant the Company a perpetual, worldwide, royalty free, non-exclusive, and sub-licensable right and license to exploit and exercise all such technology and rights in support of the Company's exercise or exploitation of any such assigned Work (s) (including any modifications, improvements and derivatives thereof).

6. <u>Non-Solicitation of Business Relationships</u>. Consultant shall not, during Consultant's employment and retention and **for a period of twelve (12) consecutive months following separation of**

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

**employment** and retention with Company for whatever reason, solicit, divert, perform work for, or take away any current **or prospective customers, clients or business relations of Company (regardless of where located)** whom Consultant called upon, solicited, worked with, **or became acquainted with during the course of his/her employment and retention with Company**. However, this restriction shall not prohibit Consultant from calling upon, soliciting, or working with any current or prospective customer, client or business relation with whom Consultant called upon, solicited, worked with prior to beginning employment and retention with Company. Further, it shall not be a violation of this provision if, without solicitation by Consultant, a former customer of Company becomes a customer at a property where Consultant is subsequently employed or retained to consult.

(emphasis added).

377.    Following her termination by Defendant, NGD HOMESHARING in February 2019, DIFFENDERFER seeks employment with a real estate development entity with projects throughout the United States, and whose business activities may be, or may become, similar to that of Defendant, NGD HOMESHARING. This may require DIFFENDERFER to call on contacts she has in the industry including prospective customers, clients, business relations she became acquainted with during the term of her misclassified employment with NGD HOMESHARING. This may also require DIFFENDERFER to indirectly use, transmit or communicate general data, knowledge and information she has regarding the broadly defined industry and business activities she engaged in during her employment with NGD HOMESHARING, much of which she herself created and was her brainchild.

378.    In their current iteration, the restrictive covenants purport to prohibit her from engaging in any of the foregoing activities.

379.    The restrictive covenants do not protect a legally protectable interest but are intended solely to prohibit or diminish competition and preclude DIFFENDERFER's employment in the same field or industry as Defendant, NGD HOMESHARING.

380.     On information and belief, in multiple instances, corporate governance documents, restrictive covenant agreements, and oral permission and/or "side letters" excusing compliance with same have been the product of conflict of interest transactions in which various employees, contractors, principals and/or investors of Defendant, NGD HOMESHARING have been excused from compliance with such restrictive covenants and no effort to enforce the restrictive covenants against them has been attempted.

381.     Conversely, in an unambiguous and express manner, in May 2019, through its representatives, including its Chief Financial Officer and General Counsel, Defendant, NGD HOMESHARING expressed to DIFFENDERFER that it fully intended to enforce restrictive covenants against her should she seek employment in Defendant, NGD HOMESHARING's industry, indicating that NGD HOMESHARING would litigate against DIFFENDERFER if she sought employment in violation of any of the covenants.

382.     There is a bona fide dispute between the parties as to the reasonableness of the limitations in the restrictive covenants and their enforceability as to DIFFENDERFER, especially in light of Defendant, NGD HOMESHARING's selective enforcement of the restrictions, express waivers for favored employees, principals and investors, and the lack of protectable business interest.

383.     DIFFENDERFER has a justiciable question as to her rights and obligations under the restrictive covenants, and in particular, her rights to seek employment in the same field or industry as Defendant, NGD HOMESHARING.

384.     DIFFENDERFER is in doubt regarding her rights and obligations under the restrictive covenants, and its enforceability.

385.     There is a bona fide, actual, present need for a judicial declaration regarding (a) the

Davis Goldman, PLLC · Miami │ Hollywood · Tel 305·800·6673 · Fax 305·675·7880

reasonableness of the scope, time and place limitations in the restrictive covenants, (b) the enforceability of the restrictive covenants against DIFFENDERFER given Defendant NGD HOMESHARING's selective enforcement and absence of a protectable business interest; and (c) the parties respective rights and obligations, if any, under the restrictive covenants.

386.   All persons who have an interest in the outcome of this proceeding are parties herein.

WHEREFORE, Plaintiff, CINDY DIFFENDERFER requests this Court (a) declare the parties' respective rights and obligations under the restrictive covenants in the Backdated Agreement, and in particular; (b) declare whether the restrictive covenants are enforceable, and if not, declare them void as to DIFFENDERFER; (c) if the restrictive covenants are enforceable, declare whether the time and place restrictions in the restrictive covenants are reasonable, and if not, impose modifications as are appropriate; (d) enjoin enforcement the restrictive covenants, or any portion thereof, in a manner that is inconsistent with the Court's declarations as to validity, reasonableness and scope; and (e) grant such other and further relief as this Court deems appropriate, and award DIFFENDERFER her costs in connection with this proceeding.

## COUNT XVIII:
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS
### -Against NGD HOMESHARING-

Plaintiff, DIFFENDERFER adopts, restates and reasserts the allegations contained in Paragraphs 1-207 as though fully set forth herein.

387.   At all times material hereto, Plaintiff DIFFENDERFER possessed, and continues to possess, numerous advantageous business relationships in the real estate development industry and the internet and app-based innovation and design sector, which is the primary reason she was initially engaged by HERNANDEZ to develop and refine the Venture, making NGD

HOMESHARING what it is today. Accordingly, Defendant, NGD HOMESHARING has knowledge of these advantageous relationships that DIFFENDERFER possesses.

388.   DIFFENDERFER has legal rights to benefit and profit from her advantageous business relationships in Defendant, NGD HOMESHRING's industry and to obtain gainful employment in her chosen professional field as a result of these long-standing relationships.

389.   By Defendant, NGD HOMESHARING's representatives, including its General Counsel Stamm, unequivocally stating in May 2019 that NGD HOMESHARING intends to enforce and will enforce, including by way of litigation, the Restrictive Covenants in the 2017 and 2019 Operating Agreements and the restrictive covenants in the Backdated Agreement against DIFFENDERFER, in perpetuity, should she choose to seek employment in NGD HOMESHARING's industry, which is subject to change from time to time, Defendant NGD HOMESHARING has intentionally and unjustifiably interfered with DIFFENDERFER's rights to benefit and profit from her advantageous business relationships of which NGD HOMESHARING has knowledge.

390.   Defendant, NGD HOMESHARING's conduct is unjustified because no legitimate or protectable business interests is protected by the threat of enforcing such covenants, particularly as NGD HOMESHARING has released, waived and acquiesced to other executives engaging in the identical conduct and activity it seeks to prevent DIFFENDERFER from engaging in.

391.   As a direct and proximate result of Defendant NGD HOMESHARING's unjustified interference, Plaintiff has been damaged and continues to suffer damages.

WHEREFORE, Plaintiff, CINDY DIFFENDERFER requests judgment against Defendant NGD HOMESHARING for damages, including special damages, and enjoining Defendant's selective enforcement of the unenforceable and unreasonable Restrictive Covenants in the 2017

DAVIS GOLDMAN, PLLC · MIAMI | HOLLYWOOD · TEL 305·800·6673 · FAX 305·675·7880

and 2019 Operating Agreements and in the Backdated Agreement, together with  prejudgment interest, costs of suit,  and for such other and further relief as this Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

DIFFENDERFER demands trial by jury for all claims so triable.

Respectfully submitted on this 2nd day of August, 2019.

**DAVIS GOLDMAN, PLLC**
*Counsel for Plaintiff*
1441 Brickell Avenue, Suite 1400
Miami, FL 33131
Telephone:  (305) 800-6673
Facsimile:   (305) 675-7880
Email: jgoldman@davisgoldman.com
Secondary Email: eservice@davisgoldman.com

By:_____*s/Jason N. Goldman*_____
       JASON N. GOLDMAN
        Fla Bar No. 72527
       AARON P. DAVIS
        Fla. Bar No. 58463